2022 IL App (2d) 200640
No. 2-20-0640
Opinion filed April 29, 2022

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kane County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 18-CF-659 |
| JAMES J. BOOTS, | ) ) ) | Honorable Donald M. Tegeler Jr., |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE SCHOSTOK delivered the judgment of the court, with opinion.
Presiding Justice Bridges and Justice Zenoff concurred in the judgment and opinion.

**OPINION**

¶ 1    Following a bench trial, the defendant,[1] James Boots, was convicted of predatory criminal sexual assault of a child (720 ILCS 5/11-1.40(a)(1) (West 2016)) and sentenced to 11 years' imprisonment. On appeal, the defendant argues that she received ineffective assistance of counsel, her sentence was excessive, and the restitution order was erroneous. We affirm but remand for the limited purpose of allowing the trial court to set the time limit and terms for the payment of restitution.

_____

    [1] The defendant is a transgender woman. As such, female pronouns will be used to refer to the defendant in this opinion.

¶ 2                                    I. BACKGROUND

¶ 3     On May 23, 2018, the defendant was charged by indictment with one count of predatory criminal sexual assault of a child (*id.*). The indictment alleged that, in 2010, the defendant, who was 17 years of age or over, committed an act of sexual penetration with A.B., a minor child under the age of 13 years, in that the defendant placed her mouth on the sex organ of A.B.

¶ 4     The defendant waived her right to a jury trial, and on January 27, 2020, the matter proceeded to a bench trial. The defendant was represented by the public defender. In opening statements, the State argued that the evidence would show that, in 2010, the defendant committed an act of predatory criminal sexual assault against her stepdaughter, A.B. Specifically, one evening when A.B. was about 10 years old, A.B. was left home alone with the defendant and one other sibling, her sister H.B. After H.B. was put to bed, the defendant allowed A.B. to try her marijuana pipe and take a sip of an alcoholic beverage. After this, the two went up to A.B.'s bedroom, as it was A.B.'s bedtime. After A.B. crawled into bed, the defendant removed A.B.'s pajama pants and pulled down her underwear. The defendant then placed her mouth on A.B.'s vagina.

¶ 5     Defense counsel's opening statement began, "[t]he State's Attorney is correct, this incident happened in 2010." Defense counsel further explained that the defendant herself actually brought the case to the attention of medical staff, a social worker, and a detective in 2017. Defense counsel stated that the trial court would hear why the defendant disclosed the information and what the defendant wanted to do with the information. Defense counsel asserted that, after the trial court heard what happened in 2010, the State would not be able to prove the defendant guilty of predatory criminal sexual assault.

¶ 6     A.B. testified that she was born in the spring of 2001. She had two older siblings and four younger siblings. A.B. testified that the defendant was her stepfather. They lived in various places

but the incident at issue occurred when she lived in Elgin with her mother, M.B., the defendant, and H.B. A.B. testified that she remembered an incident in 2010 when her mother had to go to the hospital. It was during her mother's pregnancy with a younger sibling, I.B., who was born in October 2010. In the evening when her mother was at the hospital, the defendant put H.B. to bed. After that, A.B. and the defendant went to the basement. The defendant was smoking marijuana from a pipe. The defendant gave A.B. the pipe and she smoked from it too. The defendant also gave A.B. her drink, which was a Jack and Coke, and A.B. had a couple sips. After that, they left the basement and went up to A.B.'s bedroom. A.B. was wearing pajamas and underwear. After A.B. crawled into bed, the defendant took A.B.'s pajama pants and underwear off and put her mouth on A.B.'s vagina. The defendant's mouth and tongue touched her vagina. She felt the defendant's mouth and tongue moving. It lasted about two or three minutes. She lay there because she did not know what to do and felt uncomfortable and scared. When the defendant was done, the defendant put her underwear and pants back on and they both went to the bathroom. A.B. urinated and then went to bed. A.B.'s mom came home from the hospital the next day. A.B. was too scared to tell her mother about the incident.

¶ 7     A.B. further testified that, sometime after the incident, when they still lived in Elgin, she and the defendant talked about it. A.B. was home alone with the defendant. A.B. was crying because her mother was not there and A.B. asked the defendant if she was going to put her mouth on her again. The defendant looked upset, went into the hallway, crouched on the floor, put her hands through her own hair, and asked A.B., "Did it feel weird?" A.B. did not respond and they did not talk about it again.

¶ 8     On cross-examination, A.B. testified that, when she lived in Elgin with M.B. and the defendant, the only other sibling who lived there was H.B. Her older siblings, D.B. and R.B., came

over on weekends occasionally because her mother had split custody. A.B. called the defendant, "Mommy Jamie." The defendant helped take care of her by making her food and helping to put her to bed. Her mother and the defendant regularly smoked marijuana and drank in the home. A.B. knew there was marijuana in the pipe, and she was excited to try it. She had a couple sips of the defendant's drink, but the defendant was not forcing her. A.B. acknowledged that she could only estimate that the defendant's mouth was on her for two or three minutes, as she did not have a clock in her bedroom. The defendant did not threaten her or force her down on the bed. A.B. never told her mother or any teachers at school about the incident. A.B. ultimately told a social worker after the defendant confessed at a hospital.

¶ 9 Detective Andrew Houghton testified that he worked for the major investigations division of the Elgin Police Department. On January 10, 2018, he was given a referral from the Department of Children and Family Services (DCFS) to investigate a crime that occurred in 2010. DCFS became involved because the defendant had made statements to someone at a hospital regarding the incident. Houghton testified that he and another detective interviewed the defendant on March 28, 2018. Before asking questions, he procured a *Miranda* waiver (see *Miranda v. Arizona*, 384 U.S. 436 (1966)) from the defendant. Houghton identified a copy of the *Miranda* waiver, which was admitted into evidence. Houghton testified that the interview with the defendant was audio and video recorded. He identified a DVD that contained the recording, and it was admitted into evidence. The recording of the interview was played in court.

¶ 10 On cross-examination, Houghton testified that, prior to the interview of the defendant, he obtained the defendant's medical records from when she disclosed the incident. He also received the DCFS report and a report from the child advocacy center (CAC) in Champaign County, which was where A.B. was living in 2018. The report from the CAC included a forensic interview of

A.B. as well as H.B. and M.B. Houghton acknowledged that, based on the records, he was aware that the defendant disclosed the incident to various people, including a nurse, a social worker, and other medical staff. Thereafter, someone made a report to DCFS. Houghton testified that, at the time he interviewed the defendant, she was living in Freeport. She was cooperative and rode to the police department with him. Houghton testified that the defendant was very emotional during the interview. When the interview was done, they took her back to her apartment. Later, a warrant was issued, and the defendant was arrested. Houghton acknowledged that the defendant was still living in the same apartment and did not try to flee or resist arrest.

¶ 11    In the recorded interview, Houghton provided the defendant with *Miranda* warnings and the defendant signed a waiver. The defendant stated that she understood her rights and that she was willing to speak with the police. Houghton, the defendant, and another officer were present for the interview. Houghton told the defendant that if she, at any time, wanted an attorney, she should let them know. The detectives let the defendant refill her water bottle and use the restroom during the interview.

¶ 12    The defendant acknowledged that her birthdate was August 24, 1969. She stated that she knew that the police wanted to talk about a misunderstanding she had with one of her children, A.B. The defendant stated that she "started to cross a boundary that [she] didn't realize was harmful" but that she "stopped [her]self." This occurred when she, M.B., A.B., and H.B. lived together in Elgin. A.B. was about 8 to 10 years old at the time of the incident.

¶ 13    The defendant stated that, one evening when M.B. was not at home, she put H.B. to bed. After that, she and A.B. went into the basement. They spent most of the evening talking, laughing, and having a good time. They talked about marijuana and cigarettes because A.B. was curious. The defendant was smoking marijuana, and she let A.B. try it. The defendant stated that she was

really high and that, at some point, her "brain got all jumbled up" and she thought that A.B. wanted intimate contact. This occurred while she was putting A.B. to bed. The defendant stated that she leaned over to kiss A.B.'s vagina but saw a look of horror on A.B.'s face and realized that she was doing something wrong. She stopped, gave A.B. a kiss on the forehead, and left the room.

¶ 14    Houghton told the defendant that he talked to A.B. and that A.B. gave a similar version of what happened but that there were additional details from A.B. that the defendant was not providing. Houghton told the defendant that she and A.B. both deserved to have the truth come out. Houghton then asked if A.B. was lying about the additional details she provided. The defendant said that A.B. was not lying. The defendant then stated that she pulled down A.B.'s pants a little and kissed her on the vagina. The defendant admitted that her lips touched A.B.'s vaginal skin. The defendant stated that it lasted only a second because she saw the fear in A.B.'s eyes. She stopped, kissed A.B. on the forehead, and left the room. Houghton asked if the defendant went in the bathroom to wash out her mouth afterwards. The defendant stated that she might have. When the interview was complete, the detectives drove the defendant back to her home.

¶ 15    The parties stipulated that, if called, M.B. would testify that she is married to the defendant. In 2010, M.B. was living in a house in Elgin with the defendant, A.B., and H.B. She was also pregnant with I.B. I.B. was born on October 16, 2010. One day in 2010, prior to I.B.'s birth, M.B. was required to stay overnight in the hospital due to pregnancy related complications. The defendant was left home along with A.B. and H.B. M.B. did not see what occurred between A.B. and the defendant. Thereafter, the State rested and the defense did not call any witnesses.

¶ 16    In closing argument, the State argued that the evidence showed that, at the time of the incident at issue, A.B. was about 10 years old and the defendant was over 17 years old, as the defendant's statement indicated that she was born in 1969. The State argued that the defendant

committed an act of sexual penetration on A.B., by placing her mouth on A.B.'s sex organ. The State explained that the statute defined sexual penetration, in part, as any contact between the sex organ of one person and the mouth of another person. The State reiterated that the evidence showed that the defendant placed her mouth and tongue on the naked skin of A.B.'s vagina. The defendant moved her mouth and tongue on A.B.'s vagina, and it lasted for two or three minutes. The State noted that the defendant's recorded statement corroborated A.B.'s testimony as to what occurred. The State asserted that it had proved the case beyond a reasonable doubt.

¶ 17    Defense counsel argued that it was the defendant herself who disclosed the incident, around Christmas in 2017. Defense counsel pointed out that the defendant was very emotional during the recorded interview. She was sobbing and clearly suffering. Defense counsel stated that, because the defendant had disclosed the incident to medical personnel, she had no reason to lie during her recorded interview with Houghton. The defendant disclosed the information because she wanted to get help for herself and for A.B. Defense counsel argued that the recorded statement indicated that the defendant did not force, threaten, or drug A.B. Defense counsel noted that, in the recorded interview, the defendant indicated that she had started to put her mouth toward A.B.'s vagina but, when she saw the look of horror on A.B.'s face, she stopped. Defense counsel argued that there was no contact between the defendant's mouth and A.B.'s sex organ and that the defendant admitted that there was contact only after Houghton told her, "that's not what [A.B] said." Defense counsel argued that the defendant was very emotional and loved her children. She admitted that there was contact only after Houghton accused her of calling A.B. a liar. Further, the defendant's statement, "maybe there is a kiss, or I don't know. It was confusing," was equivocal. Defense counsel asked the trial court to consider how distraught the defendant was when she made her

admission. Defense counsel noted that the defendant cared for A.B. for many years and A.B. did not disclose any incident prior to the defendant's statements.

Defense counsel further argued that, if the trial court found that there was contact, the trial court should consider the lesser included offense of aggravated criminal sexual abuse, which is based on sexual conduct such as fondling or touching between the defendant's mouth and A.B.'s sex organ. Defense counsel asserted that it was a surface-to-surface contact. Defense counsel acknowledged that predatory criminal sexual assault of a child also included contact, however slight. But, she argued, if any mouth to sex organ touch would be predatory assault and never aggravated criminal sexual abuse, the aggravated criminal sexual abuse statute should include an exception for mouth to sex organ touching but noted that it did not include any exception. Defense counsel asserted that the statutes were vague as to what would apply in this case and that thus the trial court should be lenient. Because the statutes did not indicate that mouth to sex organ touching was always predatory criminal sexual assault, the lesser included offense of aggravated criminal sexual abuse should apply.

¶ 18    Following argument, the trial court found that the evidence showed that the incident at issue occurred in 2010. At that time, A.B. was younger than 13 and the defendant was older than 17. The trial court found both A.B. credible in her testimony and the defendant credible in her recorded interview with the police. The trial court found the defendant guilty of predatory criminal sexual assault.

¶ 19    On July 23, 2020, after denying the defendant's motion for judgment notwithstanding the verdict or a new trial, the matter proceeded to sentencing. The defendant made a statement in allocution. The defendant stated that she was very sorry for what happened and had tried to make it up to A.B. by being a good parent. She ultimately disclosed the incident because she wanted

A.B. to get help for pain and mental health struggles resulting from the incident. The defendant asserted that, if her sentence was too harsh, A.B. "will regret what she did and it will make things worse for her." The defendant asked for the minimum sentence, noting that she had other children to take care of. The defendant stated that she was a valued member of society and a business owner. The defendant stated that she hoped to make amends for her behavior, but she could not do so from a prison cell.

¶ 20    The trial court stated that it considered, in mitigation, that the defendant's conduct did not cause serious physical harm, the defendant did not have an extensive criminal history, and the defendant had mostly led a law-abiding life. The trial court noted that the defendant had mental health issues but was receiving adequate treatment while in custody. The trial court commented, as an aside, that the defendant wanted consideration for being the one who reported the incident to medical personnel. The trial court noted, nonetheless, that A.B. had to come to court to testify in front of strangers, which hardly showed that the defendant was looking out for her.

¶ 21    In aggravation, the trial court considered that the defendant's conduct caused serious psychological harm to A.B. The trial court also considered that the defendant was A.B.'s stepparent and that she was in a position of trust, which was obliterated. The trial court also considered that the sentence should be a deterrent to others.

¶ 22    The trial court stated that it read the presentence investigation report (PSI) and listened to the defendant and the arguments of counsel. The PSI indicated that the defendant had been sexually molested as a child. The PSI also included a statement from A.B. that indicated that she had sought mental health counseling as a result of the abuse. A.B. stated that, at one point, she spent $200 per month for six months on counseling, for a total cost of $1200. The trial court sentenced the defendant to 11 years' imprisonment and 3 years' mandatory supervised release. The trial court

ordered the defendant to pay a $250 DNA fee and $1200 in restitution. The trial court further ordered that the defendant register as a sex offender. Following the denial of her motion to reconsider the sentence, the defendant filed a timely notice of appeal.

¶ 23                                II. ANALYSIS

¶ 24    The defendant's first contention on appeal is that defense counsel provided ineffective assistance in failing to subject the State's case against her to any meaningful adversarial testing. Ordinarily, in determining whether a defendant was denied the effective assistance of counsel, a defendant must show both that counsel's performance was deficient and that the deficiency prejudiced the defendant. *People v. Cherry*, 2016 IL 118728, ¶ 24 (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). However, this two-part test need not be applied, and prejudice will be presumed, where (1) the defendant is denied counsel at a critical stage of the proceedings, (2) counsel entirely fails to subject the State's case to meaningful adversarial testing, or (3) counsel is called upon to represent a client in circumstances under which no lawyer could provide effective assistance. *Id.* ¶ 25 (citing *United States v. Cronic*, 466 U.S. 648, 659-61 (1984)).

¶ 25    The United States Supreme Court has characterized the second *Cronic* exception, failing to subject the State's case to meaningful adversarial testing, as narrow and infrequently applied. See *id.* ¶ 26 (citing *Florida v. Nixon*, 543 U.S. 175, 190 (2004)). For the exception to apply, it is not enough that counsel failed to oppose the prosecution at specific points in the proceeding. *Id.* (citing *Bell v. Cone*, 535 U.S. 685, 697 (2002)). Rather, counsel's failure must be complete, such that he or she failed to oppose the prosecution throughout the proceeding as a whole. *Id.* Accordingly, courts have rarely applied the second *Cronic* exception, explaining that only nonrepresentation, not poor representation, triggers the presumption of prejudice under *Cronic*. *Id.* (citing *Miller v. Martin*, 481 F.3d 468, 473 (7th Cir. 2007)). The application of the second *Cronic*

exception is so rare that, in the 30 years since *Cronic* was decided, our supreme court has found *per se* ineffectiveness under this exception in only two cases. *Id.* ¶ 27.

¶ 26 In arguing that counsel was *per se* ineffective under *Cronic*, the defendant relies on one of those two cases, *People v. Hattery*, 109 Ill. 2d 449 (1985). In *Hattery*, the defendant pleaded not guilty to the murder of a woman and her two children. *Id.* at 458. In opening statements, the prosecution described the circumstances of the murders. Despite the not guilty plea, defense counsel asserted, in opening statements, that the defendant "did everything" the prosecution stated he did and that he, defense counsel, was "not asking [the jury] to find [the defendant] not guilty." (Internal quotation marks omitted.) *Id.* at 458, 464. Further, defense counsel advanced no theory of defense at trial, presented no evidence, and did not make a closing argument. *Id.* at 459. In holding that defense counsel was *per se* ineffective, our supreme court emphasized that defense counsel's concession of guilt in opening statements was unequivocal. *Id.* at 464. The *Hattery* court also noted that defense counsel's trial strategy, which attempted to show that the defendant was guilty of murder but undeserving of the death penalty, was at odds with the defendant's plea of not guilty. *Id.*

¶ 27 In the present case, the defendant argues that, as in *Hattery*, defense counsel was *per se* ineffective in conceding her guilt during opening statements, failing to conduct meaningful cross-examination of the State's witnesses or present any evidence in defense, and again conceding guilt and misapplying the law in closing arguments.

¶ 28 The defendant's contention is without merit, as defense counsel did not fail to subject the State's case to meaningful adversarial testing. Unlike in *Hattery*, defense counsel in this case did not unequivocally concede the defendant's guilt in opening statements. Defense counsel acknowledged, in her opening statement, that "this incident happened in 2010" but did not state

what specific acts the defendant committed. Further, defense counsel ultimately argued that the prosecution would not be able to prove that the defendant was guilty of predatory criminal sexual assault. This is in stark contrast to the circumstances in *Hattery*, where defense counsel stated that he was not asking the jury to find the defendant not guilty.

¶ 29     Further, defense counsel in this case did not fail entirely to cross-examine the State's witnesses or present a defense. The defendant argues that defense counsel did not cross-examine either A.B. or Houghton in such a manner as to cast doubt on their credibility or bolster the defendant's defense. However, defense counsel questioned A.B. about her marijuana and alcohol use on the day of the incident, implicitly attacking her ability to remember the events at issue. Defense counsel also questioned A.B. about her delayed disclosure of the event, thus challenging her credibility. The defendant argues that such a challenge was fruitless, as it is common for victims of child sex offenses to delay reporting, out of fear or shame. While we agree that attacking A.B.'s credibility on this basis was weak, it does not mean that defense counsel failed to provide meaningful adversarial testing. See *People v. Ganus*, 148 Ill. 2d 466, 474 (1992) ("A weak or insufficient defense does not indicate ineffectiveness of counsel in a case where a defendant has no defense. *** [I]t would appear that defense counsel used his imagination and resourcefulness to come up with something where he had nothing to go on.").

¶ 30     While the defendant argues that defense counsel did not effectively cross-examine Houghton, the defendant does not indicate what line of questioning defense counsel failed to pursue. Houghton's testimony was largely related to what was shown on the recorded interview, which the trial court was able to view. Further, defense counsel elicited testimony from Houghton indicating that he was aware of the content of A.B.'s CAC disclosure statement at the time of the defendant's interview and counsel then argued in closing that Houghton used that information to

prompt the defendant's admission to making physical contact with A.B.'s vagina. The defendant's argument that defense counsel failed to present a defense is without merit because, at a minimum, defense counsel required the State to put on its case and prove the defendant guilty beyond a reasonable doubt. See *Cronic*, 466 U.S. at 656 (the *Cronic* standard is not met where defense counsel holds the State to its burden of proof); *Cherry*, 2016 IL 118728, ¶ 29 (the *Cronic* exception applies only when counsel entirely fails to subject the State's case to meaningful adversarial testing).

¶ 31    The defendant also argues that defense counsel failed to conduct any meaningful adversarial testing because counsel conceded the defendant's guilt and misapplied the law during closing arguments. Upon our own review of the record, we conclude that defense counsel did not concede the defendant's guilt. While defense counsel stated, in closing, that the defendant initially disclosed the incident and had no reason to lie during the police interview, defense counsel further argued that the defendant's initial statement to the police was the truth, that she saw the look of horror on A.B.'s face, stopped herself, and never actually made physical contact with A.B.'s vagina. Defense counsel argued that the defendant admitted to making contact only when prompted by the police and that she did so because she was emotionally distraught and missing her children. Further, defense counsel argued that the defendant's confession was equivocal in that she stated, "Yeah, maybe there is a kiss, or I don't know. It was confusing."

¶ 32    The defendant also asserts that defense counsel had a misunderstanding of the law. Specifically, the defendant asserts that defense counsel was arguing in closing that the evidence was insufficient to prove predatory criminal sexual assault because there was no penetration, only surface-to-surface contact. The defendant mischaracterizes defense counsel's argument. Defense counsel never argued that the evidence was insufficient because there was no penetration. Rather,

defense counsel argued that, if the trial court found that there was, in fact, contact between the defendant's mouth and A.B.'s vagina, then the surface-to surface contact supported a finding of guilt on the lesser included offense of aggravated criminal sexual abuse. The argument was that, since the same alleged conduct satisfied both statutes, the statutes were vague and that a finding of guilt on the lesser offense was appropriate. Although this argument may have been weak, it does not indicate ineffective assistance of counsel. *Ganus*, 148 Ill. 2d at 474.

¶ 33 In summary, as defense counsel did not concede the defendant's guilt, cross-examined the witnesses, and argued in closing that the defendant was not guilty, the defendant's argument that defense counsel failed to conduct any meaningful adversarial testing is without merit. *Cf. Hattery*, 109 Ill. 2d at 458-59 (no meaningful adversarial testing where defense counsel conceded guilt in opening statement, advanced no theory of defense at trial, presented no evidence, and did not make a closing argument); *People v. Morris*, 209 Ill. 2d 137, 182-85 (2004), *overruled in part on other grounds by People v. Pitman*, 211 Ill. 2d 502 (2004) (no meaningful adversarial testing where defense counsel admitted the defendant's guilt and introduced evidence of the defendant's involvement in another grisly and unrelated murder).

¶ 34 The defendant alternatively argues that, even if defense counsel's performance does not bring the case within the scope of *Cronic* and *Hattery*, defense counsel was ineffective under *Strickland*. As noted above, to prevail on a claim of ineffective assistance of counsel under *Strickland*, a defendant must show both that counsel's performance was deficient and that the deficient performance prejudiced the defendant. *Cherry*, 2016 IL 118728, ¶ 24. More specifically, the defendant must demonstrate that counsel's performance was objectively unreasonable under prevailing professional norms and that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S.

at 694. A defendant must satisfy both prongs of the *Strickland* test to prevail, and the failure to establish either prong precludes a finding of ineffective assistance of counsel. *People v. Henderson*, 2013 IL 114040, ¶ 11.

¶ 35    The defendant's argument is based on the premise that defense counsel conceded the defendant's guilt in closing argument and that defense counsel argued that surface-to-surface contact was insufficient to prove predatory criminal sexual assault, demonstrating a misapprehension of the law. As discussed above, these assertions are inaccurate representations of the record. Defense counsel did not concede the defendant's guilt in closing argument. Further, defense counsel did not demonstrate a misapprehension of the law. Defense counsel argued that, since the alleged contact satisfied the elements of both predatory criminal sexual assault and aggravated criminal sexual abuse, the defendant should be found guilty of only the lesser offense, aggravated criminal sexual abuse. Accordingly, the defendant has failed to establish either prong of the *Strickland* test with these arguments.

¶ 36    The defendant also argues that defense counsel conducted insufficient cross-examination of the State's witnesses, did not move to dismiss the indictment or present evidence that the predatory criminal sexual assault statute was unconstitutionally vague, and failed to move to suppress the defendant's confession based on coercion. These arguments are also unavailing. The defendant has failed to establish that defense counsel's performance was objectively unreasonable under prevailing professional norms. Defense counsel argued that the defendant's confession was the result of being distraught and confused, and of prompting by the police, and that the State failed to prove that the defendant made any contact with the victim. While the defense was ultimately unsuccessful, this does not establish that defense counsel's representation was objectively unreasonable. See *People v. Shatner*, 174 Ill. 2d 133, 148 (1996) ("If a defendant enters a not-

guilty plea in the face of overwhelming evidence of his guilt, we are unwilling to find that his counsel was ineffective simply because he failed to contrive a leak-proof theory of innocence on defendant's behalf.").

¶ 37    The defendant argues that defense counsel conducted insufficient cross-examination of the State's witnesses. However, the defendant has not established that defense counsel's cross-examination was objectively unreasonable. As noted above, defense counsel's cross-examination of A.B. elicited responses that challenged her credibility, and the cross-examination of Houghton suggested that the defendant's confession had been coerced by the interrogation. On appeal, the defendant does not suggest any other lines of questioning that would have challenged A.B.'s credibility or elicited responses that would have supported an acquittal.

¶ 38    Finally, also without merit are the defendant's arguments that defense counsel was ineffective in failing to file motions to suppress the indictment and her confession and in failing to present evidence that the predatory criminal sexual assault statute was unconstitutionally vague. The decision of whether or not to file pretrial motions is generally considered a matter of trial strategy, and a possible error in that strategy does not rise to the level of ineffective assistance. *People v. Martin*, 236 Ill. App. 3d 112, 121 (1992). Moreover, the defendant does not allege on appeal any facts that would have supported the filing of any pretrial motions or supported a vagueness challenge to the statute and has not shown that any such challenges would have had any probability of success. See *People v. Patterson*, 217 Ill. 2d 407, 438 (2005) (the failure to file a motion does not establish deficient representation when the motion would have been futile). Accordingly, the defendant has failed to establish ineffective assistance of counsel.

¶ 39    The defendant's second contention on appeal is that her 11-year prison sentence is excessive. The defendant argues that the trial court did not properly weigh her significant potential

for rehabilitation as demonstrated by her lack of criminal history, her ability to overcome a sexually abusive childhood, and her completion of over 180 courses during the two years she was incarcerated prior to sentencing. The defendant also argues that the trial court made comments indicating that it based her sentence, in part, on a desire to punish her for exercising her right to trial.

¶ 40    The Illinois Constitution provides that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. To achieve the constitutionally mandated balance between the retributive and rehabilitative purposes of punishment, the trial court must carefully consider all aggravating and mitigating factors, including "the defendant's age, demeanor, habits, mentality, credibility, criminal history, general moral character, social environment, and education, as well as the nature and circumstances of the crime and of defendant's conduct in the commission of it." *People v. Quintana*, 332 Ill. App. 3d 96, 109 (2002).

¶ 41    "[T]he trial court is in the best position to fashion a sentence that strikes an appropriate balance between the goals of protecting society and rehabilitating the defendant." *People v. Risley*, 359 Ill. App. 3d 918, 920 (2005). Thus, we may not disturb a sentence within the applicable sentencing range unless the trial court abused its discretion. *People v. Stacey*, 193 Ill. 2d 203, 209-10 (2000). A sentence is an abuse of discretion only if it is at great variance with the spirit and purpose of the law or manifestly disproportionate to the nature of the offense. *Id.* at 210. We may not substitute our judgment for that of the trial court merely because we might weigh the pertinent factors differently. *Id.* at 209.

¶ 42    In determining an appropriate sentence, relevant considerations include the nature of the crime, the protection of the public, deterrence, and punishment, as well as the defendant's

rehabilitative prospects. *People v. Kolzow*, 301 Ill. App. 3d 1, 8 (1998). The weight to be attributed to each factor in aggravation and mitigation depends upon the particular circumstances of the case. *Id.* There is a presumption that the trial court considered all relevant factors in determining a sentence, and that presumption will not be overcome without explicit evidence from the record that the trial court did not consider mitigating factors or relied on improper aggravating factors. *People v. Payne*, 294 Ill. App. 3d 254, 260 (1998).

¶ 43    After reviewing the record, we conclude that the trial court did not abuse its discretion when it sentenced the defendant to 11 years' imprisonment. The offense of predatory criminal sexual assault of a child is a Class X felony with a sentencing range of 6 to 60 years' imprisonment. See 720 ILCS 5/11-1.40(b)(1) (West 2018). Because the defendant's 11-year sentence fell within the applicable sentencing range, we presume that the sentence is proper. *People v. Charleston*, 2018 IL App (1st) 161323, ¶ 16. This presumption will be rebutted only if the defendant makes an affirmative showing that the sentence greatly departs from the spirit and purpose of the law or the constitutional guidelines. *People v. Boclair*, 225 Ill. App. 3d 331, 335 (1992). The defendant has not made such a showing.

¶ 44    The defendant argues that the trial court did not place enough weight on her rehabilitative potential, which was demonstrated in her lack of criminal history, self-imposed treatment for the sexual abuse she suffered as a child, and significant participation in educational courses while incarcerated. However, at the sentencing hearing, the trial court stated that it considered the defendant's lack of criminal history and that she had, for the most part, led a law-abiding life. The trial court clearly weighed the factors in mitigation, as it sentenced the defendant to a term of years much closer to the minimum sentence than the maximum. Further, the trial court is presumed to have considered the defendant's rehabilitative potential (*Payne*, 294 Ill. App. 3d at 260), and there

is nothing in the record to rebut that presumption. Further, in imposing a sentence that was five years over the minimum, the trial court considered relevant factors in aggravation. Specifically, the trial court considered that the offense caused the victim serious psychological harm, the defendant was A.B.'s stepparent and thus in a position of authority and trust, and the sentence was necessary to deter others. The defendant's potential for rehabilitation is not entitled to more weight than these aggravating factors. *People v. Weiser*, 2013 IL App (5th) 120055, ¶ 32. The defendant is essentially asking this court to reweigh the evidence in aggravation and mitigation. We decline to reweigh the evidence or substitute our judgment for that of the trial court. *Stacey*, 193 Ill. 2d at 209.

¶ 45    The defendant also argues that the trial court erred in basing her sentence, in part, on a desire to punish her for exercising her right to trial. A sentence will be set aside where it was imposed because the defendant refused to plead guilty and instead availed herself of her constitutional right to trial. *People v. Ward*, 113 Ill. 2d 516, 526 (1986).

¶ 46    In so arguing, the defendant refers to the following, which occurred at the sentencing hearing. The trial court noted that one of the defendant's arguments in mitigation was that the defendant was the one who ultimately came forward with the information that resulted in her prosecution for the offense. The defendant asserted that she did so because she wanted to prompt A.B. to get help for the psychological harm that resulted from the incident. As to this argument, the trial court stated:

>    "THE COURT: What is conveniently left out of that is while the defendant is doing all of that, exercising the constitutional rights that every one [*sic*] enjoys, the victim also came to court and had to testify in open court about what happened to her to people she doesn't know. I say that as an aside. That's not exactly looking out for the victim."

¶ 47    The defendant's argument that her sentence was imposed as a punishment for exercising her right to trial is clearly rebutted by the record. In the above quote, the trial court stated that this was only "an aside." Further, after stating the above, the trial court also stated that it does "not punish people for exercising their rights." The trial court explained that its sentence was based on the acts and character of the defendant and what it believed was an appropriate sentence. The trial court then reiterated:

> "THE COURT: I do not sentence people for exercising their rights. I cannot sentence people for some of the editorial comments that I hope sink in in the future while you are sitting in jail thinking about what you have done and what you have not done in relation to this case."

Accordingly, after noting that A.B. was required to come to court to testify, the trial court stated twice that it was not basing its sentence on this observation or on the defendant's exercise of her right to trial. The defendant's argument is thus without merit.

¶ 48    The defendant's final contention on appeal is that the restitution order should be vacated because the trial court failed to consider the defendant's ability to pay, to fix a method of payment, and to set a time period for it to be paid in full. The defendant concedes that she did not object at the sentencing hearing or raise the issue in a postsentencing motion but argues that we should review this issue under the plain-error doctrine or as an ineffective assistance claim.

¶ 49    In the sentencing context, unpreserved errors may be reviewed under the plain-error doctrine if (1) the evidence at sentencing was closely balanced or (2) the error was so egregious as to deny the defendant a fair sentencing hearing. *People v. Walsh*, 2016 IL App (2d) 140357, ¶ 17. The first inquiry under plain-error review is to determine whether error actually occurred. *People v. Morrow*, 2014 IL App (2d) 130718, ¶ 11.

¶ 50    Section 5-5-6(f) of the Unified Code of Corrections (Code) provides in relevant part:

"Taking into consideration the ability of the defendant to pay, *** the court shall determine whether restitution shall be paid in a single payment or in installments, and shall fix a period of time not in excess of 5 years, *** within which payment of restitution is to be paid in full. *** However, if the court deems it necessary ***, [it] may extend [the period of time] beyond 5 years." 730 ILCS 5/5-5-6(f) (West 2018).

In setting the amount of restitution, the trial court "is not required to consider a defendant's financial circumstances." *People v. Day*, 2011 IL App (2d) 091358, ¶ 56. Rather, "the trial court is required to consider the ability to pay only when determining the *time and manner of payment* or when considering a petition to revoke restitution." (Emphasis in original.) *Id.* Compliance with the statute is mandatory. *People v. White*, 146 Ill. App. 3d 998, 1004 (1986).

¶ 51    In the present case, the trial court's restitution order did not set forth (1) the date by which the defendant was to pay restitution or (2) whether the defendant was to pay in a lump sum or in installments. In *People v. Brooks*, 158 Ill. 2d 260, 272 (1994), our supreme court excused a trial court's failure to set the manner for payment of restitution where the trial court set a concrete deadline for the payment of restitution. Under those circumstances, the *Brooks* court held that it could be inferred that restitution was to be paid in a single payment. *Id.* Here, unlike *Brooks*, the trial court did not set a deadline for the restitution payment. A restitution order is "fatally incomplete" when the trial court "does not specify a particular time" for payment. *In re Estate of Yucis*, 382 Ill. App. 3d 1062, 1067 (2008). We thus conclude that the trial court erred in failing to set a time limit for payment of the restitution as required by the statute.

¶ 52    As we have determined that the trial court erred in failing to set a deadline for payment of the restitution, we must next determine whether this error rises to the level of plain error. We

conclude that plain-error review is appropriate in this case under the second prong, as the error challenges the integrity of the judicial process and undermines the fairness of the defendant's sentencing hearing. See *People v. Mullen*, 2018 IL App (1st) 152306, ¶ 38 ("We can and should review legal errors in the assessment of fines and fees as plain error."). The defendant needs to know the deadline for payment of restitution, as there are consequences for not complying with a restitution order. See 730 ILCS 5/5-5-6(b) (West 2018) (if restitution is not paid in the time and manner specified by the court, the court may order the seizure of the defendant's property).

¶ 53    Moreover, even if this error did not rise to the level of second-prong plain error, we could review the error in the interests of justice. See *People v. Hibbler*, 2019 IL App (4th) 160897, ¶ 81 (despite the defendant's forfeiture, the matter was remanded for compliance with section 5-5-6(f) of the Code in setting the time and manner of payment of restitution); *People v. Fontana*, 251 Ill. App. 3d 694, 704-05 (1993) (noting that forfeiture was a limitation on the parties and addressing, in the interest of justice, the trial court's failure to set the time and manner of payment of restitution). We note that one of the purposes of restitution is to make a victim of a crime whole. *Id.* at 707. Without a deadline for the payment of restitution, the defendant could not be found delinquent in failing to pay. Without a delinquency, a crime victim could not enforce a restitution judgment. See 730 ILCS 5/5-5-6(m)(3) (West 2018) (a restitution order acts as a judgment lien in favor of the victim, who may enforce any payment that is delinquent). Accordingly, we remand for the limited purpose of allowing the trial court to determine, taking into consideration the defendant's ability to pay, the terms and timeframe for the defendant to satisfy her restitution obligation. Our resolution of this issue makes it unnecessary to address the defendant's remaining claim that her trial counsel rendered ineffective assistance in failing to object to the restitution order.

¶ 54                    III. CONCLUSION

¶ 55    For the reasons stated, the defendant's conviction and sentence are affirmed and we remand for the limited purpose of allowing the trial court to set a time limit and terms for the payment of restitution.

¶ 56    Affirmed and remanded with directions.

**No. 2-20-0640**

| | |
|---|---|
| **Cite as:** | *People v. Boots*, 2022 IL App (2d) 200640 |
| **Decision Under Review:** | Appeal from the Circuit Court of Kane County, No. 18-CF-659; the Hon. Donald J. Tegeler, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Douglas R. Hoff, and Bryon M. Reina, of State Appellate Defender's Office, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Jamie L. Mosser, State's Attorney, of St. Charles (Patrick Delfino, Edward R. Psenicka, and Victoria E. Jozef, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |