2023 IL App (2d) 220333-U
No. 2-22-0333
Order filed June 13, 2023

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kendall County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 18-CF-261 |
| GARY D. CASTLE JR., | ) ) | Honorable John F. McAdams, |
| Defendant-Appellant. | ) | Judge, Presiding. |

PRESIDING JUSTICE McLAREN delivered the judgment of the court.
Justices Jorgensen and Schostok concurred in the judgment.

**ORDER**

¶ 1   *Held*: The trial court erred in denying defendant's postconviction petition where defendant, who had pleaded guilty to drug-induced homicide, was deprived of his constitutional right to the effective assistance of counsel in connection with his plea: there is a reasonable probability that, had defendant's attorney reviewed discovery with defendant, defendant would have chosen to go to trial. Reversed and remanded with directions.

¶ 2   Defendant, Gary D. Castle Jr., appeals from the denial, after an evidentiary hearing, of his petition under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2020)) for relief from his conviction of drug-induced homicide (720 ILCS 5/9-3.3(a) (West 2018)).  Although defendant pleaded guilty to that offense, he argues that the evidence at the hearing on his petition

established that he was deprived of his constitutional right to the effective assistance of counsel in connection with his plea. We reverse and remand.

¶ 3                                    I. BACKGROUND

¶ 4     Defendant was indicted on a single count of drug-induced homicide based on the allegations that he unlawfully delivered a controlled substance containing fentanyl to Bradley Friel and that Friel's death was caused by the injection, inhalation, absorption, or ingestion of that controlled substance. A private attorney represented defendant. On March 14, 2019, defendant pleaded guilty per an agreement with the State that he would receive a 12-year prison sentence, to be served at 75%, in exchange for his plea. In reciting the agreement, the prosecutor added, "This case will run consecutive to Kendall County case [No.] 17 CF 213, but concurrent to [case No.] 18 CF 116."[1] After noting that defendant appeared in court "on a writ from [the] Illinois Department of Corrections[ ]" and would need to be "booked and processed[,]" the prosecutor added, "that's the sum and substance of the disposition[.]"

¶ 5     Before accepting defendant's plea, the trial court asked defendant whether anyone had threatened defendant or promised him anything to get him to plead guilty. Defendant responded, "No." The trial court asked defendant whether he had an opportunity to speak with his attorney about the case and whether his attorney answered all his questions. Defendant answered, "Yes[,]" to both questions. Defendant also confirmed that he was pleading guilty voluntarily.

¶ 6     The factual basis for the plea was as follows:

---

[1]We note that records available from the circuit court of Kendall County's website show that defendant entered guilty pleas on June 4, 2018, in case Nos. 17-CF-213 and 18-CF-116.

"[I]f the State would proceed to trial, the State would call witnesses previously tendered in disclosure who would testify that on March 24, 2018, sheriff's deputies and medical personnel were dispatched to 20 Ashlawn Avenue in Montgomery, Kendall County, Illinois for a report of an overdose. The victim being [Friel].

Friel's mother had contacted the police and the 911 dispatch when she returned and found her son on the couch, white foam around his mouth, no pulse or breathing.

The testimony would be that Mr. Friel was transported to Rush Copley Hospital and pronounced dead on March 25, 2018, just after midnight.

An autopsy was completed, and testimony would be presented that the determination of death was that intoxication of—I'll spell it, cyclo, P-R-O-P-Y-L, Fentanyl, F-E-N-T-A-N-Y-L; intoxication.

Investigators searched Mr. Friel's phone, found contacts and recent conversations via text messages, a message string, between the defendant and a number they identified belonging to—between Mr. Friel and the defendant[ ] ***.

During the message string there were talks or discussion of purchasing or picking up jabs, which based on the investigator's information, would refer to heroin.

The two settled on an agreement that [defendant] would provide heroin to [Friel] in exchange for a gold chain.

During the investigation there was discussion that Mr. Friel had, in fact, tendered over a gold chain in exchange for heroin. And that subsequent conversations between Mr. Friel and [defendant] were that [defendant] was not happy with the quality of the necklace, that he believed it to be false or fake.

After follow-up conversation between the two, that chat ceased, and it coincided approximately about the same time that it was determined that Mr. Friel had expired.

Follow-up investigation with [defendant] from investigators were [*sic*] that in an interview with [defendant,] he acknowledged that he had, in fact, confirmed selling drugs to [Friel]. And that he, [Friel], and another unidentified male named Frank had gone to Chicago to purchase heroin. Six bags were purchased. They split them. And it was confirmed to coincide with the time frame right before Mr. Friel expired.

All events occurring in Kendall County, Illinois."

¶ 7    The trial court accepted defendant's plea and imposed sentence in accordance with the parties' agreement.

¶ 8    On March 26, 2021, defendant filed a *pro se* petition under the Act claiming that he received ineffective assistance of counsel. He claimed that his trial attorney (1) coerced him with threats that, if he did not plead guilty, he could be sentenced to up to 90 years in prison; (2) did not familiarize himself with Friel's toxicology report or present it to the trial court; and (3) did not argue that no heroin was found "in the possession of, or on common premises of, either [defendant] or [Friel]." Along with the petition, defendant submitted, *inter alia*, a toxicology report detailing the results of testing performed on samples of Friel's blood and urine collected at the hospital and during the postmortem examination.

¶ 9    On April 30, 2021, the trial court entered an order docketing the petition for further proceedings and appointing the Kendall County Public Defender to represent defendant. See 725 ILCS 5/122-2.1(b), 122-4 (West 2020). On February 22, 2022, postconviction counsel filed an amended petition. The amended petition alleged that, when defendant entered his guilty plea, his trial attorney had not (1) investigated the nature of the allegations against defendant or

(2) discussed any potential evidence with defendant. The amended petition further alleged that defendant had no access to discovery materials before entering his plea. Defendant was able to review the discovery materials only after obtaining them via a Freedom of Information Act (FOIA) (5 ILCS 140/1 *et seq.* (West 2020)) request to the Kendall County Sheriff's Department. Before entry of his plea, defendant also lacked access to Friel's toxicology report (attached to both the *pro se* petition and the amended petition), which showed that Friel's blood and urine contained multiple substances. Among other findings, the report indicated that Friel's urine tested presumptively positive for cocaine. According to the amended petition, "[t]here was no evidence that any alleged narcotics recovered by law enforcement during their investigation contained fentanyl and cyclopropylfentanyl." The amended petition further alleged that, if defendant "[h]ad *** been given the opportunity to review the evidence and his potential defenses, [he] would not have entered in [*sic*] the plea and would have stood on his right to trial."

¶ 10 The amended petition also alleged that defendant had been "threatened, coerced and forced" to plead guilty in that his trial attorney erroneously told him that he could receive a prison term of up to 90 years if he rejected the State's plea offer.

¶ 11 Exhibits to the amended petition included: (1) Illinois Department of Corrections records showing that defendant's trial attorney never visited defendant or spoke with him by telephone while he was incarcerated at the Illinois River Correctional Center before entering his plea; (2) the toxicology report; and (3) the report from Friel's postmortem examination, ascribing Friel's death to cyclopropylfentanyl and fentanyl intoxication. The State moved to dismiss the amended petition, but the trial court denied the motion and set the amended petition for an evidentiary hearing.

¶ 12    At the hearing on the amended petition, defendant testified that when he was charged in this case, he was incarcerated at the Illinois River Correctional Center for an unrelated drug offense. His family retained a private attorney to represent him in this case. Defendant's only meetings with the attorney took place in the holding cell at the Kendall County Courthouse on the days of defendant's four court appearances on September 4, 2018, November 13, 2018, January 22, 2019, and March 14, 2019. During these meetings, they never discussed what evidence the State had against defendant or reviewed any discovery materials produced by the State. Between the court dates, defendant had no communication with his attorney in person, by telephone, or otherwise.

¶ 13    During their meeting on January 22, 2019, defendant asked if he could see the State's discovery. His attorney said he did not have it with him. Defendant did not ask his attorney to send him the discovery materials. Defendant testified that between January 22, 2019, and March 14, 2019, he tried to call his attorney to obtain the discovery materials. However, his attorney told defendant not to call his office, because he did not accept collect calls. Defendant acknowledged that he did not write to or ask family members to call his attorney to obtain the discovery materials.

¶ 14    Defendant testified that, on March 14, 2019, his attorney informed him that the State had offered him a 12-year prison sentence, to be served at 75%, if he pleaded guilty to drug-induced homicide. According to defendant, his attorney advised him to accept the offer. Defendant testified,

> "He told me that if I didn't take it and I was found guilty at trial, I could face 9 to 60 if the Class X was enhanced, and then if I was extended-term eligible, if they enhance the other charges, I could face anywhere from 60 to 90 years."

He later learned he was not eligible for a sentence over 30 years.

¶ 15    In July 2020, defendant sent a FOIA request to the Kendall County Sheriff's Department seeking material related to his case. In response, defendant received police reports. Additionally, at defendant's request, his trial attorney sent him Friel's toxicology report. According to defendant, the police reports indicated that numerous baggies with burnt-off corners were found "in the presence of Mr. Friel" before he was taken to the hospital. Defendant explained that baggies are often used to package narcotics. According to defendant's account, the police reports indicated that the baggies were not collected or tested for the presence of narcotics. Asked what other substances were found at the scene, defendant responded, "Numerous pill bottles, a blue glass container with an unknown liquid in it that was never tested, marijuana, I think a hitter box, and that might have been it." Nothing tested positive for the presence of heroin.

¶ 16    Defendant also testified that the police reports revealed that law enforcement authorities made copies of photos from Friel's phone during the investigation. Defendant received copies of those photos as part of his FOIA request. Defendant noticed that some of the photos depicted baggies with pictures of blue devils on them. Those photos "were allegedly sent from [defendant] to Mr. Friel[.]" In defendant's experience, the blue devil images indicated that the baggies were used to package narcotics. Defendant testified that the blue devil baggies in the photos he allegedly sent Friel were not found when Friel's home was searched after he was taken to the hospital. Defendant testified that, if he had had the opportunity to review all the discovery produced by the State, he would not have pleaded guilty.

¶ 17    On cross-examination, defendant admitted that he supplied Friel with heroin before his death and that fentanyl "is something used often to mix with heroin[.]" Defendant also admitted that, at the plea hearing, he did not protest to the trial court that his attorney had not shown him

the State's evidence. Defendant acknowledged that he was convicted of felony theft in 2012, felony possession of a controlled substance in 2014 and 2018, and retail theft in 2017.

¶ 18    The State did not present any evidence.

¶ 19    On August 31, 2022, the trial court denied the petition in a written order. The trial court found that defendant's trial attorney did not perform deficiently. Notably, however, the trial court did not address the allegation that defendant's trial attorney failed to provide him with the State's discovery or review it with him. The trial court also found that defendant did not show that he had a plausible defense to the charge of drug-induced homicide and, thus, did not establish prejudice. The trial court reasoned:

> "[Defendant] admitted he gave heroin to [Friel]. The fact that there were no Blue Devil baggies (the baggies containing the heroin which [defendant] gave to [Friel]) on the scene does not mean that [Friel] did not use the heroin given to him by [defendant]. [Friel] could have used the heroin with the Blue Devil baggies at a different location or transferred the heroin to a different baggie or destroyed the baggies. The lack of Blue Devil baggies is not a plausible defense.

> *** Finally, [defendant] has not presented any evidence that the baggie [Friel] used did not contain fentanyl. Rather, [defendant] simply alleges there was no evidence the baggie of heroin used by [Friel] which was given to him by [defendant] contained fentanyl."

Defendant filed a timely notice of appeal.

¶ 20                                II. ANALYSIS

¶ 21    Before proceeding, we note that the State argues defendant's plea here was part of a "global plea agreement" that included case No. 17-CF-213 and case No. 18-CF-116. The State argues that

"[b]y challenging only his guilty plea on the instant case, defendant is improperly seeking to retain the benefit of his bargain on the two additional cases while seeking to deprive the State of their benefit in the instant case." The argument is meritless. The State appears to assume that it made some sentencing concession in the other cases in exchange for his plea in *this* case. The record belies that assumption. Here the prosecutor recited the State's agreement with defendant: he would plead guilty and receive a 12-year prison sentence to be served concurrently with his sentence in case No. 18-CF-116 but consecutively to his sentence in case No. 17-CF-213. The prosecutor stated, "that's the sum and substance of the disposition[.]" The State cannot now argue that the agreement had unstated terms affording defendant a benefit in other cases.

¶ 22    We now consider whether defendant adequately established grounds for relief under the Act. The Act permits a criminal defendant to mount a collateral challenge on a conviction or sentence if it substantially violates the defendant's constitutional rights. *People v. Ross*, 2022 IL App (2d) 210068, ¶ 15. As we explained in *Ross*:

> "The Act provides for a three-stage proceeding, and a defendant must satisfy the requirements of each before continuing to the next stage. [Citation.] At the first stage, the trial court has 90 days after the filing and docketing of the petition to review it without input from the State. [Citation.] The petition must present the gist of a constitutional claim, and the petition will survive so long as it is not frivolous or patently without merit. [Citations.] A petition that is not dismissed within 90 days must advance to second-stage proceedings under sections 122-4 through 122-6 of the Act [citation]. [Citations.]
>
> At the second stage, the trial court may appoint counsel for the defendant, if the defendant is indigent. [Citation.] After counsel has made any necessary amendments to the defendant's claims, the State may move to dismiss or may answer the petition.

[Citation.] The petition and any accompanying documentation must make a substantial showing of a constitutional violation. [Citation.] All well-pleaded facts that are not positively rebutted by the record are taken as true. [Citation.] Finally, at the third stage, the trial court conducts an evidentiary hearing to determine whether a new trial is warranted. [Citation.] At that time, it makes fact-finding and credibility determinations. [Citation.] The defendant must again make a substantial showing of a constitutional violation. [Citation.]" *Id.* ¶¶ 16-17.

Courts review for manifest error a decision to deny postconviction relief following an evidentiary hearing. *People v. Reed*, 2020 IL 124940, ¶ 51.

¶ 23 In his amended petition, defendant claimed, *inter alia*, that trial counsel's failure to review discovery with him before his guilty plea amounted to ineffective assistance of counsel.[2] As our supreme court explained in *People v. Hall*, 217 Ill. 2d 324, 334-36 (2005):

"A challenge to a guilty plea alleging ineffective assistance of counsel is subject to the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). [Citations.] Under *Strickland*, a defendant must establish that counsel's performance fell below an objective standard of reasonableness and the defendant was prejudiced by counsel's substandard performance. [Citation.]

An attorney's conduct is deficient if the attorney failed to ensure that the defendant's guilty plea was entered voluntarily and intelligently. [Citation.] ***.

---

[2]As noted, defendant also claimed that he had been "threatened, coerced and forced" to plead guilty. Defendant does not argue on appeal that he is entitled to postconviction relief on that basis.

To establish the prejudice prong of an ineffective assistance of counsel claim ***, the defendant must show there is a reasonable probability that, absent counsel's errors, the defendant would have pleaded not guilty and insisted on going to trial. [Citation.] A bare allegation that the defendant would have pleaded not guilty and insisted on a trial if counsel had not been deficient is not enough to establish prejudice. [Citation.] Rather, the defendant's claim must be accompanied by either a claim of innocence or the articulation of a plausible defense that could have been raised at trial. [Citation.] *** [T]he question of whether counsel's deficient representation caused the defendant to plead guilty depends in large part on predicting whether the defendant likely would have been successful at trial. [Citation.]"

¶ 24 Counsel's decision as to what discovery materials to share with the defendant is normally considered a matter of strategy that will not support a claim of ineffective assistance of counsel. See *People v. Walker*, 2019 IL App (3d) 170374, ¶ 18. However, a defendant may show that counsel's performance was deficient under *Strickland* where counsel "withheld discovery information that cast doubt on the State's ability to prove him guilty or was otherwise particularly relevant to his decision to plead guilty." *Id.* Here, defendant testified that his attorney did not discuss the State's evidence against him or give him access to discovery materials that suggested the State had little or no evidence that the substance he supplied to Friel contained the cyclopropylfentanyl and fentanyl that caused Friel's death.

¶ 25 The State argues that the record rebuts defendant's claim that counsel failed to discuss any of the State's discovery with him. The State notes that, before defendant entered his plea, the trial court asked him whether he had the opportunity to speak with counsel and whether counsel had been able to answer all his questions. Defendant answered, "Yes[,]" to both queries by the trial

court. The State argues that defendant's answers "undercut" his claim that counsel failed to review discovery with him. However, we fail to see how simply meeting with defendant and answering his questions implies that counsel reviewed discovery with him.

¶ 26    The State also stresses that defendant "did not identify any concerns or issues" after his plea's factual basis was presented to the court. However, the State does not explain why defendant should have had any issues or concerns with the factual basis or how his failure to express concerns has any bearing on whether counsel reviewed discovery with him.

¶ 27    The State notes that, at the hearing on his amended petition, defendant admitted that he did not inform the trial court at the plea hearing that counsel had not shown him any of the evidence in the case. The State implies that, if reviewing discovery were important to defendant, he would have spoken up. However, even though defendant testified that he made some attempts to obtain the State's discovery from counsel, it does not appear that this was a matter of major concern to defendant at the time or that it undermined his confidence in counsel's advice regarding the State's plea offer. Defendant apparently trusted counsel's advice, despite counsel's failure to review discovery with him. Thus, it is not surprising that defendant refrained from interrupting the plea proceeding (which might have jeopardized his agreement with the State) by protesting counsel's failure to provide the State's discovery materials to him.

¶ 28    As previously noted, the trial court did not find incredible defendant's testimony that counsel failed to review discovery with him. Rather, the court simply did not address defendant's contention that counsel was neglectful in that respect. The State presented no evidence refuting defendant's testimony on the subject. For instance, the State did not call defendant's trial counsel as a witness to rebut defendant's account. Accordingly, the trial court's conclusion that defendant failed to establish deficient performance was against the manifest weight of the evidence.

¶ 29     We turn to whether counsel's failure to review discovery with defendant engendered prejudice within the meaning of *Strickland*. The State insists that it did not. The State notes that there is no question that defendant provided controlled substances to Friel on the day of Friel's death. The State observes that, at the hearing on his petition, defendant (1) confirmed that he sold heroin to Friel and (2) acknowledged that heroin is often mixed with fentanyl. Furthermore, according to the State, defendant had no evidence to contradict the finding in the postmortem examination report that Friel died of cyclopropylfentanyl and fentanyl intoxication. According to the State, "[d]efendant now asks this Court to speculate that the drugs he provided to [Friel] was [*sic*] not the cause of his death." The argument implies that, to be entitled to postconviction relief, defendant was obligated to prove that the drugs he provided to Friel did not cause his death. To the contrary, to establish prejudice, defendant was obligated to show that he would not have pleaded guilty if his trial attorney had reviewed the State's discovery with him or had at least provided the State's discovery to him. To that end, defendant needed to claim innocence *or* articulate a plausible defense *that he could have raised at trial*. See *Hall*, 217 Ill. 2d at 335-36. "It is axiomatic that the State carries the burden of proving each element of a charged offense beyond a reasonable doubt." *People v. Murray*, 2019 IL 123289, ¶ 28. That burden remains on the State throughout the trial and never shifts to the defendant. *Id.* A defense may consist simply of holding the State to its burden of proof and subjecting its case to meaningful adversarial testing.[3]

---

[3]The trial court evidently made the same mistake as the State, stressing that defendant had no plausible defense, in part because he "ha[d] not presented any evidence that the baggie [Friel] used did not contain fentanyl." Clearly, the trial court incorrectly regarded a plausible defense as requiring proof of innocence.

See *People v. Boots*, 2022 IL App (2d) 200640, ¶ 31 ("The defendant's argument that defense counsel failed to present a defense is without merit because, at a minimum, defense counsel required the State to put on its case and prove the defendant guilty beyond a reasonable doubt" (citing *United States v. Cronic*, 466 U.S. 648, 656 (1984), and *People v. Cherry*, 2016 IL 118728, ¶ 29)). If the State's evidence of guilt is particularly weak, the defense is plausible. See *id.* ¶ 31.

¶ 30      Here, the postmortem examination report ascribed Friel's death to cyclopropylfentanyl and fentanyl intoxication. Defendant confessed to supplying heroin to Friel, but the postmortem examination report, the toxicology report, and the police reports (as described in defendant's unrebutted testimony) do not indicate that law enforcement authorities had any evidence that the substance defendant supplied to Friel contained either cyclopropylfentanyl or fentanyl. According to defendant's testimony, the police reports revealed that baggies of the type used to package narcotics were found "in the presence of Mr. Friel." However, defendant also testified that the police reports indicated that none of the baggies were collected or tested for the presence of narcotics. The State offered no testimony to the contrary. Thus, the State apparently had no evidence that Friel had been supplied with heroin adulterated with cyclopropylfentanyl and fentanyl. (Indeed, the State apparently had little or no evidence that Friel had used *any* heroin, *with or without fentanyl*, shortly before his death.) Although it is undisputed that heroin is often sold laced with fentanyl, so are other street drugs, including cocaine. See U.S. Dep't. of Just., *Opioid Facts*, https://www.justice.gov/opioidawareness/opioid-facts [https://perma.cc/PSW5-QXBW] (last visited May 1, 2023) ("Fentanyl *** is often used to adulterate heroin, cocaine, methamphetamine and other 'street drugs.' ") Friel's urine tested presumptively positive for the presence of "Cocaine/Metabolites." In addition, according to the United States Department of Justice, "Fentanyl appears in fake tablets, pills, and gel capsules attempting to mimic certain

prescription drugs." *Id.* Defendant testified that the police reports indicated that, in addition to baggies, the police found "[n]umerous pill bottles, a blue glass container with an unknown liquid in it that was never tested, [and] marijuana[ ]" in Friel's home. Friel could have ingested a counterfeit substance containing the fentanyl that caused his death. It is also possible that Friel knowingly ingested fentanyl.

¶ 31    *United States v. Jones*, 420 F. Supp. 3d 242 (S.D.N.Y. 2019) is instructive. In that case, a jury found the defendant guilty of intentionally and knowingly distributing, and possessing with intent to distribute, a controlled substance containing heroin, fentanyl, and furanylfentanyl. *Id.* at 244. The evidence established that William Gable met Diana Haikova in December 2017. *Id.* at 246. On December 5, 2017, Gable observed Haikova use cocaine at a music studio. *Id.* He also saw Xanax at the studio. *Id.* Gable obtained heroin from the defendant. *Id.* Gable testified that the heroin was " 'the best that [he] could get his hands on.' " *Id.* Haikova was found dead in her apartment two days later. *Id.* at 247. A sample of her femoral blood was found to contain a variety of substances including fentanyl, furanylfentanyl, cocaine, methylenedioxymethamphetamine (MDMA or "Ecstasy"), methylenedioxyamphetamine (MDA), morphine, and alprazolam. *Id.* at 247-48. Gable later assisted police with a controlled purchase of heroin from the defendant. *Id.* at 247. While in custody, the defendant admitted to police that he gave Haikova heroin at her apartment on December 5, 2017. *Id.* at 246.

¶ 32    After the jury returned its guilty verdict, the defendant moved for a judgment of acquittal notwithstanding the verdict. *Id.* at 244. The *Jones* court granted the motion. *Id.* at 255-56. The court observed that there was no direct evidence that the heroin defendant sold Haikova was mixed with fentanyl and furanylfentanyl. *Id.* at 255. The trial court added:

"Even without direct evidence that the heroin that the defendant gave to Haikova contained fentanyl and furanylfentanyl, the jury could rely on circumstantial evidence if that evidence was sufficient to prove beyond a reasonable doubt that the heroin the defendant provided was in fact mixed with fentanyl and furanylfentanyl. One piece of circumstantial evidence submitted to the jury was that several experts testified that fentanyl and furanylfentanyl are commonly milled with heroin to make the product stronger. However, the experts acknowledged that fentanyl can also be used to adulterate Xanax, ecstasy, and cocaine, and the toxicology report showed that Xanax, ecstasy, and cocaine, and their metabolites, were found in Haikova's blood. Moreover, [an expert in drug trafficking] testified that fentanyl can, on its own, be pressed like a pill to look like aspirin or Oxycodone. While a jury could conclude that fentanyl and furanylfentanyl are used to adulterate heroin, the expert testimony could not establish beyond a reasonable doubt that the heroin distributed by the defendant in this instance was milled with fentanyl and furanylfentanyl." *Id.* at 253.

Similarly, if this case had gone to trial on the evidence reflected in the postmortem examination report, the toxicology report, and the police reports (as described by defendant), defendant could have plausibly argued that the evidence was insufficient to prove beyond a reasonable doubt that whatever substance defendant supplied to Friel contained fentanyl and cyclopropylfentanyl. Accordingly, there is a reasonable probability that, had defendant's attorney reviewed discovery with defendant, defendant would have chosen to go to trial. Therefore, the trial court's decision to deny postconviction relief was manifestly erroneous.

¶ 33                                    III. CONCLUSION

¶ 34     For the reasons stated, we reverse the judgment of the circuit court of Kendall County and remand for entry of an order granting defendant's amended petition, vacating defendant's conviction, and ordering a new trial.

¶ 35     Reversed and remanded with directions.