**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2024 IL App (3d) 230375-U

Order filed August 16, 2024

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2024

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 12th Judicial Circuit, Will County, Illinois, |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) ) | Appeal No. 3-23-0375 Circuit No. 18-CF-1740 |
| Tomas Rekasius, | ) ) | Honorable Amy Bertani-Tomczak, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE Brennan delivered the judgment of the court.
Presiding Justice McDade and Justice Hettel concurred in the judgment.

_____

**ORDER**

¶ 1    *Held*:  We affirm defendant's convictions and sentence for one misdemeanor and eight felonies stemming from a single incident involving the use of a firearm.

¶ 2    Following a bench trial, the court convicted defendant, Tomas Rekasius, of one misdemeanor and eight felonies stemming from a single incident involving the use of a firearm: armed habitual criminal (count I), aggravated discharge of a firearm (count II), unlawful use of a weapon by a felon (count III), two counts of possessing a firearm without a FOID card (counts IV and V), two counts of aggravated unlawful use of a weapon (counts VI and VII), reckless discharge

of a firearm (count VIII), and unlawful violation of an order of protection (count IX). The court subsequently sentenced defendant to two concurrent 8-year terms at 85% on counts I and II, Class X and Class 1 felonies, respectively, with the other counts merging. The court exercised its discretion to order that the concurrent 8-year sentences in the instant case run consecutively to a 20-year sentence at 50% in a separate Cook County case where defendant was convicted of aggravated battery (strangulation) and aggravated battery (public place). Defendant appeals, challenging the sufficiency of the evidence and the trial court's decision that the 8-year sentence in the instant case run consecutively to the 20-year sentence in the Cook County case. For the reasons that follow, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4        The State charged defendant with the aforementioned offenses, in pursuit of its theory that, on June 28, 2018, defendant drove his vehicle into a residential subdivision and, following a verbal confrontation, fired a single shot in the direction of James Bailey. The incident occurred while defendant was on pretrial release for the Cook County batteries.

¶ 5                               A. Trial: The State's Case

¶ 6        At trial, the State called five witnesses: Samantha Keeton (defendant's then girlfriend), Paul Wotjena (a neighbor), Amanda Bailey, James Bailey, and Deputy Charles Kahr.

¶ 7                                  1. Samantha Keeton

¶ 8        Samantha Keeton testified that she had been in a relationship with defendant. Keeton obtained an order of protection based on the conduct for which defendant was ultimately convicted in the Cook County case. However, on the day in question, she entered his vehicle to go to the beach with him. The sky was clear and it was between 3 p.m. and 5 p.m. On the way to the beach, defendant stopped at the Bailey residence. Defendant told Keeton to keep her head down. Keeton

complied, though she was able to hear and see from her periphery the following. James Bailey approached defendant's vehicle. James and defendant had a "heated" conversation, wherein defendant expressed his belief that James owed him money for car repairs. Defendant grabbed a gun from the driver's door compartment, exited the vehicle, raised his arm at a 15-degree angle, and fired a single shot. James was "like WTF" and persons Keeton believed to be James's girlfriend (or wife) and children screamed. James started his vehicle, which had a loud engine. Defendant jumped back in his vehicle, told Keeton to lay back in her seat, and drove away. Defendant soon after stopped, pointed "the" gun at Keeton, told her that he had to "hurry" to "go handle other business," and dropped her off at her parked car.

¶ 9        Keeton testified that she was familiar with guns. She herself had handled and fired both firearm guns and "BB" guns. She knew the difference in both appearance and sound. She believed defendant had used and fired a "real" gun.

¶ 10        "Almost immediately" after the incident, the Alsip Police Department contacted Keeton. An officer interviewed Keeton in her home. Keeton informed the police that defendant had taken her gun prior to the incident. She told the police this because, if her gun was later found in defendant's possession, she did not want to "get in trouble." Still, she did not believe that defendant had used her gun in the incident because the gun used in the incident had a laser on it and hers did not.

¶ 11        Approximately six weeks after the incident, the Will County Sheriff's Department interviewed Keeton. Keeton drove herself to the interview. She did not make her statement "right away," because she was still "with" defendant and she was scared.

¶ 12        On cross-examination, defense counsel questioned Keeton about apparent inconsistencies between her testimony and the recorded Will County interview. Keeton agreed that, in the Will

3

County interview, she did not mention that defendant had been abusive toward her, that she had been looking down, or that witnesses had screamed. Keeton explained that she had still been working out her feelings toward defendant at the time of the interview and that "in general there was just too much to intake." Moreover, she assumed the deputies were already aware of the alleged abuse since it precipitated the Cook County case.

¶ 13                                2. Paul Wotjena

¶ 14        Paul Wotjena testified that, on the day in question, he was above water in his backyard pool when he heard a vehicle "screech" into the neighborhood. He looked over and saw, from a distance of 300 to 400 feet, a "bulky" white man exit the vehicle and point a gun north, in the direction of the Baileys' house. He saw and heard the man fire a gun. At age 81, Wotjena was familiar with guns because he grew up hunting and had served in the military.

¶ 15        On cross-examination, Wotjena agreed that the Alsip police interviewed him shortly after the shooting. Wotjena told the police that "the guy shot a gun." He may not have specified to police that day that he "saw" the perpetrator shoot the gun. However, he testified that he did in fact see the actual gun fire: "No. I saw the individual fire the gun." Also: "Well, I know it was a gun. I mean, when the thing discharged, I saw the smoke come out of it." Wotjena described the gun: "I could tell by the sound and what I saw it was not a long rifle, it was a pistol." Wotjena could not specify what kind of pistol it was:

> "A. *** I couldn't tell you what kind of pistol it was. I could tell you it was a small
>
> gun in a hand because there was no barrel sticking out[.]
>
> Q. Okay. So your only point of reference in giving your opinion, that this was a
>
> real gun, is from you being in your pool [300] to 400 feet away; agreed?
>
> A. Correct."

4

¶ 16 In addition, Wotjena testified that he was concerned because there were "a lot of young kids in [the] neighborhood." Wotjena did not identify defendant in court.

¶ 17                                    3. Amanda Bailey

¶ 18 Amanda Bailey testified that she was in the process of removing her young son from his car seat when defendant pulled his vehicle into the other side of her U-shaped driveway. She recognized defendant to be an associate of her husband. She did not pay much attention to him until she heard a gunshot. At that time, she saw that defendant's car had reversed and that defendant had fired the shot from the street yet still near the driveway. She saw the gun. She believed the gun to be of "normal" size, though she was not "super familiar" with guns.

¶ 19 On cross-examination, Amanda again addressed her familiarity with guns:

"Q. When you say [that you are] not really [familiar with guns], can you expound[?]

A. I don't know the names of any guns.

                                    ***

A. Yeah. I mean, I've shot a gun before, but as far as anything else, like any knowledge on them, no.

                                    ***

Q. Do you know for certain that [defendant] had a real firearm?

A. Yes.

Q. How do you know that?

A. By the way it sounded."

¶ 20 Amanda agreed that, in her statement to police, she reported that she saw defendant fire the gun. However, she testified that she did not actually see the precise moment the gun was fired. Amanda did not identify defendant in court.

¶ 21                                    4. James Bailey

¶ 22        James Bailey testified consistent with Amanda, with additional details. James knew defendant from prison. James had been convicted of, *inter alia*, residential burglary. Defendant pulled his vehicle into James's driveway. James saw defendant's girlfriend, Keeton, in the passenger seat. James spoke to defendant while defendant remained seated in the driver's seat. Defendant accused James of owing him money. As the conversation grew more heated, defendant threatened that, if he did not get the money soon, "then you are smoked and I will smoke your whole family." At that time, James saw that defendant had a weapon. James believed that defendant retrieved the weapon from the center console. James was standing right outside the driver's window and estimated that the gun was two feet away. James replied: "Hey, whoa, whoa, whoa. I've got my kids here. I've got my family here." Defendant then reversed out of the driveway. As defendant did so, he pointed the gun over Keeton and at James. He did not fire the gun at that point. Soon after, when defendant's vehicle was out of the driveway, James saw defendant's door open. James testified:

> "A. I saw [defendant's] body come out [of the vehicle], I saw the handgun as well.
>
> ***
>
> So at that time I'm thinking that I'm going to get shot. I heard the shot go off. And as soon as the shot went off, I turned around and booked it.
>
> Q. When you saw the gun coming out of the vehicle, what direction was it facing?
>
> A. Towards me."

¶ 23        After defendant shot the gun, he drove away. There was only one way in and one way out of the neighborhood. James got in his vehicle and followed defendant just far enough to see that

6

his family was safe. James stated: "I was hoping that [defendant] didn't go back around down Oak Street because my family was outside there."

¶ 24 During cross-examination, James testified that, when defendant fired the shot, James stood 60 feet away. James agreed that in his statement to police, he had stated only that defendant threatened to "smoke" James and made no reference to "smoking" the rest of the family. James did not specify in his statement to police that defendant pulled the gun from the center console. He did specify in his statement to police that he believed the gun to be a semi-automatic .40 caliber handgun. He continued to believe that the gun was a semi-automatic .40 caliber handgun, which he was familiar with from target practice.

¶ 25                             5. Deputy Charles Kahr

¶ 26 Deputy Charles Kahr testified that, on the day in question, he responded to a dispatch for a shot fired. With several assisting officers and a K-9, he searched for a single shell casing in the general location of where the shot was alleged to have been fired. His team walked the street, the shoulder of the street, and the ditch. The ditch was east of the roadway, full of weeds and tall grass, with water running through it. The team did not find a shell casing. Kahr interviewed the Baileys and Wotjena.

¶ 27 At the close of the State's case, defendant unsuccessfully moved for a directed finding.

¶ 28                             B. Trial: Defendant's Case

¶ 29 Defendant presented two witnesses: Kahr and Detective Kimberly Topolewski. Kahr testified that, in his interview, Wotjena did not use the words "I heard a gunshot." Wotjena did not say that he "saw an arm go up and heard a gun go off." Instead, Wotjena said he heard a "pop." Kahr also agreed that he did not ask James whether *James* had a gun, nor did he pat down James in search of a gun.

7

¶ 30    Topolewski testified that she conducted Keeton's Will County interview. Keeton had a nervous laugh, but Topolewski did not consider her demeanor unusual. Keeton did not inform Topolewski that defendant pointed a gun at her before she left the vehicle. During the interview, Topolewski asked Keeton to be forthcoming about her own criminal history so that investigators could continue to use her as a witness and "a victim."

¶ 31                                  C. Convictions and Sentence

¶ 32    The trial court found defendant guilty and sentenced him as indicated. At the sentencing hearing, the parties presented evidence in mitigation and aggravation, which we discuss in conjunction with our analysis. The trial court recognized that it had the discretion to order that defendant's 8-year sentence in the instant case run concurrently with his 20-year sentence in the Cook County case. However, stating that it had considered the facts of the case, defendant's criminal history, and evidence in mitigation and aggravation, it ordered that defendant's 8-year sentence in the instant case run consecutively to his 20-year sentence in the Cook County case. Defendant filed unsuccessful post-trial and post-sentencing motions, and this appeal followed.

¶ 33                                         II. ANALYSIS

¶ 34    On appeal, defendant challenges the sufficiency of the evidence resulting in his convictions. Defendant also challenges the trial court's decision that the instant sentence run consecutively to the sentence in the Cook County case.

¶ 35                              A. Sufficiency of the Evidence

¶ 36    Defendant challenges the sufficiency of the evidence resulting in his convictions. When considering a defendant's challenge to the sufficiency of the evidence, the reviewing court must determine whether, viewing the evidence in a light most favorable to the State, any rational trier of fact could have found the required elements of the crime beyond a reasonable doubt. *People v.*

8

*Collins*, 106 Ill. 2d 237, 261 (1985). The reviewing court will not substitute its judgment for that of the trier of fact on issues involving the inferences to be drawn from the evidence, the weight to be given to the evidence, or the credibility of the witnesses. *People v. Brown*, 2013 IL 114196, ¶ 48.

¶ 37 Defendant contends the State failed to prove that he used a firearm during the incident. Defendant notes that investigators failed to recover physical evidence of a gun, such as a shell casing, and that there was no evidence that investigators interviewed defendant on the day of the incident or searched his vehicle. Defendant also points to inconsistencies in the witnesses' testimony, including: whether, per Keeton, defendant drew the gun from the driver's side and stepped outside the vehicle before firing or whether, per James, defendant drew the gun from the center console and stepped only partially outside the vehicle before firing; Keeton's failure to inform the Will County interviewers that defendant pointed a gun at her before letting her out of the vehicle; and Wotjena's ability to testify in greater detail than was contained in the police report summarizing his account. Defendant contends that the "problem" of inconsistent statements was exacerbated by the State's misstatements, including: an assertion that four witnesses observed defendant with a gun; referring to gunshots, plural, while questioning Amanda; and referring to children, plural, that were put in harm's way.

¶ 38 Each of the crimes for which defendant was convicted, as charged, required the State to prove that he possessed or used a firearm. The Firearm Owners Identification Card Act defines a firearm as any device that is designed to expel a projectile by the action of an explosion, expansion of gas, or escape of gas; exceptions include BB guns, spring guns, and paintball guns. 430 ILCS 65/1.1 (West 2018). The State does not need to present physical evidence of the firearm to prove that a defendant possessed or used one. *People v. Clark*, 2015 IL App (3d) 140036, ¶ 20. Instead,

9

the testimony of a single witness, if credited, may be sufficient to establish that the defendant possessed or used a firearm. See *People v. Hunter*, 2016 IL App (1st) 141904, ¶ 16 (the victim, who had a FOID card and had previously seen a real gun, testified that the defendant "flashed" a gun appearing to be a "Glock" out of his coat for several seconds and threatened to shoot him). The witnesses need not describe the gun in detail; rather, other circumstances may support their assertion that the defendant carried a real firearm. See *People v. Jackson*, 2016 IL App (1st) 141448, ¶¶ 16-17 (the victim testified that, when he turned around to face the defendant, the handle of the gun hit him in the eye; the victim's ability to identify the part of the gun that struck him indicated that he had a sufficient opportunity to view it); *Clark*, 2015 IL App (3d) 140036, ¶ 22 (the victim testified that, from a distance of 20 to 30 feet and in a "fairly dark" area, he was able to see that the defendant carried a rifle with a red laser pointer; the victim's companion testified that, from a distance of 50 yards, he could "plainly see" a rifle; and there was no indication that the rifle was a BB gun or toy); *cf. People v. Ross*, 229 Ill. 2d 255, 258 (2008) (a toy gun was recovered and linked to the crime).

¶ 39     Here, the State's failure to produce physical evidence of a firearm was not fatal where the trial court instead chose to credit the testimony of four witnesses, each of whom was familiar with guns to varying degrees and testified that what they saw and/or heard was a "real" gun. Keeton and James each testified that they saw the gun from a few feet away. Keeton described it as having a laser, and James believed that it was a semiautomatic .40 caliber handgun. Wotjena, a military veteran, testified that he saw and heard the gun fire from 300 to 400 feet away. He saw defendant's arm raise and he saw smoke leave the gun after it was fired. He was certain it was a gun. Amanda did not see the gun being fired, but she heard it and testified unequivocally that the sound was consistent with a real gun. Evidence of additional circumstances, such as defendant's preceding

threat to James, defendant's indications of guilt (telling Keeton to keep her head down, fleeing the scene, and pointing the gun at Keeton before allowing her to leave the vehicle), the victims' reactions (screaming, calling the police, and driving around the neighborhood to confirm the safety of family members), further indicate that defendant fired a real gun.

¶ 40     Similarly, the complained-of inconsistencies were not fatal where it remained within the trial court's purview to resolve them. See *Brown*, 2013 IL 114196, ¶ 48. The State's alleged misstatements are not as problematic as defendant would have us believe, nor is there any indication in the record that the trial court was swayed by them. See *People v. Mays*, 81 Ill. App. 3d 1090, 1097 (1980) (it is presumed that the trial court relied on proper evidence). Although the State referred to gunshots, plural, while questioning Amanda, it accurately stressed throughout its case that there was only one gunshot. It used this fact in closing to explain why it was difficult to find physical evidence of the gun: "Everyone agreed they heard one gunshot. So all that would be found is one shell casing. *** But is that really uncommon to not find one single shell casing?" The State argued that defendant put children, plural, in harm's way, even though Amanda removed only a single child from the car seat. However, Keeton testified that she heard "children" screaming, Wotjena testified that there were "a lot" of children in the neighborhood, and James testified that his "kids" were home. Also, the State argued that four witnesses observed (and/or heard) defendant fire a gun, even though two of the witnesses, Amanda and Wotjena, did not identify defendant in court. However, where Keeton, defendant's former girlfriend, sat in defendant's vehicle during the commission of the offense, there is no real question of defendant's identity.

¶ 41     For these reasons, we reject defendant's challenge to the sufficiency of the evidence.

¶ 42                                    B. Sentencing

11

¶ 43    Defendant argues that the trial court abused its discretion in ordering his 8-year concurrent sentences in this case to run consecutively to his 20-year sentence in the Cook County case.

¶ 44    The Illinois Constitution requires that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. In fashioning a sentence, the trial court should consider the nature of the crime, the protection of the public, deterrence and punishment, as well as the defendant's rehabilitative prospects. *People v. Bryant*, 2016 IL App (1st) 140421, ¶ 14. We will not disturb a sentence that falls within the statutory range unless it is an abuse of discretion. *People v. Boots*, 2022 IL App (2d) 200640, ¶ 42. A court abuses its discretion when the sentence is "at variance with the spirit and purposes of the law or is manifestly disproportionate to the nature of the offense." *Bryant*, 2016 IL App (1st) 140421, ¶ 14.

¶ 45    Section 5-8-4 of the Unified Code of Corrections (Code) provides:

"A. *** When an Illinois court *** (ii) imposes a sentence of imprisonment on a defendant who is already subject to a sentence of imprisonment imposed by an Illinois court ***, then the sentences shall run concurrently unless otherwise determined by the Illinois court under this Section.

***

C. *** The court may impose consecutive sentences in any of the following circumstances:

1. If, having regard to the nature and circumstances of the offense and the history and character of the defendant, it is the opinion of the court that consecutive sentences are required to protect the public from further criminal conduct by the defendant, the basis for which the court shall set forth in the record.

12

3. If a person charged with a felony commits a separate felony while on pretrial release ***, then the sentences imposed upon conviction of these felonies may be served consecutively ***." 730 ILCS 5/5-8-4(a)(ii), (c)(1), (c)(3) (West 2018).

¶ 46　In this case, the trial court performed the proper analysis as set forth in section 5-8-4(c)(1) and (c)(3) of the Code. Under section (c)(1), the court set forth in the record its basis for imposing the consecutive sentence:

"Taking into consideration the actual facts of this case, your prior record, the evidence presented here in aggravation and mitigation, I understand that I can consider a concurrent sentence and I have considered a concurrent sentence. But because of the nature of this charge, the charges, the fact it was a firearm shot in the middle of the day in a neighborhood thankfully nobody was hurt I am going to sentence you to a consecutive sentence[.]"

In addition, section (c)(3) provided a basis for the trial court's ruling. As defendant does not dispute, he committed the instant offenses while on pretrial release in the Cook County case.

¶ 47　Defendant argues that the trial court did not consider significant evidence in mitigation, nor did it consider the Illinois Constitution's goal of restoring him to useful citizenship. Defendant's argument fails to recognize that we presume the trial court to have considered the appropriate sentencing factors unless the record affirmatively shows otherwise. *Bryant*, 2016 IL App (1st) 140421, ¶ 16. Defendant points to no affirmative misstatements by the trial court. To the contrary, as mentioned, the trial court explicitly stated that it had considered the evidence in mitigation. In addition, the record shows that the trial court had the presentence report; it began

the sentencing hearing by allowing defendant to correct his father's age in the report and noted that it was important to be accurate. The record also shows that the trial court considered defense counsel's arguments at the sentencing hearing. The court asked follow-up questions concerning defendant's health, even continuing the hearing so that defense counsel could provide an accurate answer. When the sentencing hearing resumed weeks later, defense counsel asked the court if it would like to be reminded of the factors in mitigation, and the court agreed to listen a second time to the factors in mitigation. Defense counsel thereafter reminded the court that defendant had suffered significant mental health issues dating back to his youth when he witnessed the tragic death of his teenage brother. Thus, the court actively listened not once, but twice, to the factors in mitigation. Defendant notes these and other factors in mitigation in his appellate brief, including that defendant had at one point gained admittance to the University of Illinois. Still, it is clear from the record that the trial court did, in fact, consider these factors in rendering a sentence on the lower end of the 6-to-30-year range for a Class X felony.

¶ 48     The trial court also considered factors in aggravation, including the seriousness of the offense and that defendant had five prior felony convictions. Defendant received probation for the first two of those five prior felony convictions, and, according to the presenting report, probation was terminated "unsatisfied." Defendant then committed the instant offenses while out on pretrial release for the felonies at issue in the Cook County case.

¶ 49     There is no indication that the trial court failed to consider defendant's rehabilitative potential. Instead, as mentioned, the court actively listened to defense counsel's arguments and sentenced defendant to the lower end of the 6-to-30-year range. In balance, however, where defendant had previously failed to comply with the terms of his probation and, separately, committed the instant offenses while out on pretrial release for other felonies, the court acted

14

within its discretion to order the 8-year term in the instant case to run consecutively to the 20-year term in the Cook County case.

¶ 50                                  III. CONCLUSION

¶ 51        The judgment of the circuit court of Will County is affirmed.

¶ 52        Affirmed.