2024 IL App (2d) 230128-U
No. 2-23-0128
Order filed September 4, 2024

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of De Kalb County. |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 19-CF-28 |
| | ) | |
| RONALD JOHN BIEBERITZ, | ) | Honorable |
| | ) | Marcy L. Buick, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE KENNEDY delivered the judgment of the court.
Justices Hutchinson and Mullen concurred in the judgment.

**ORDER**

¶ 1   *Held*: (1) The trial court considered defendant's mitigation evidence, as indicated by both the court's remarks at sentencing and the sentences themselves, which fell near the mid-range for the offenses; (2) the trial court properly considered the degree of psychological harm that defendant's sexual abuse caused to the child victim; and (3) defendant's aggregate sentence of 40 years was not excessive given his prior history of sexual offenses against children. Affirmed.

¶ 2   Defendant, Ronald John Bieberitz, appeals his sentence for predatory criminal sexual assault of a child (720 ILCS 5/11-1.40(a)(1) (West 2012)) and aggravated criminal sexual abuse (*id.* § 11-1.60(c)(1)(i)), both involving S.R. He argues that (1) the trial court failed to consider evidence in mitigation concerning his rehabilitative potential and caregiver responsibilities, (2) the

trial court improperly considered in aggravation the psychological harm to S.R., and (3) his aggregate term of 40 years is excessive. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4      The State indicted defendant on seven counts of sex offenses involving two victims under the age of 13, including one count of predatory criminal sexual assault of S.R. and one count of aggravated criminal sexual abuse of S.R. The remaining three charges involving S.R. were dismissed during the trial. The two charges involving S.R.'s younger brother, K.R., were severed for trial and dismissed prior to closing arguments.

¶ 5      Before trial, the court granted the State's motion to introduce at trial (1) defendant's 2014 conviction of aggravated criminal sexual abuse of D.V.,[1] a male juvenile; (2) evidence of defendant's uncharged sexual acts involving K.R.; and (3) evidence of the charged offenses involving K.R. in this case, provided those charges were severed (which they were).

¶ 6      The following evidence was presented at defendant's October 2022 bench trial.

¶ 7      Bruce R., who is S.R.'s and K.R.'s father, testified that he first met defendant through church in 1986 and their friendship grew when each had children and Bruce moved with his family to a house closer to defendant's house. In addition to seeing defendant at church events, their families spent time together. There were many times over the years that K.R. and S.R. would be at defendant's house for informal guitar lessons and defendant would sometimes pick the boys up in his car to take them to his house. On those occasions, neither Bruce nor his wife were present.

_____

[1]The State's motion referenced "D.B.," but D.V. explained at trial that he had since changed his last name.

¶ 8    When defendant was arrested in 2014 for sexual abuse (the case involving D.V.), Bruce did not suspect defendant of molesting S.R. Eventually, in July 2018, S.R. told Bruce he had "an issue" with defendant. Bruce did not ask details, explaining that it was "private" and S.R. was embarrassed. S.R. told Bruce that defendant had been released from incarceration and expressed concern to Bruce that "it would happen to someone else so he felt to protect others he wanted to make sure that this was brought back up." Bruce then took S.R. to the police.

¶ 9    K.R. testified next. At the time of trial, he was 17 years of age and had known defendant when he was growing up, describing defendant as "the best friend of my father." K.R. would see defendant at K.R.'s house and defendant's house, sometimes alone with defendant for informal, "one on one" guitar lessons. K.R.'s earliest memory of an unusual interaction with defendant was after K.R. fell on his bicycle's crossbar, injuring his genital area. K.R.'s mother was present in the living room with defendant, but defendant "offered to check it out to make sure I was okay." Defendant took K.R. up to K.R.'s bedroom, placed him in the closet, entered the closet, and closed the door. It was dark, but defendant told K.R. to close his eyes. K.R. felt something on his penis and looked down to see defendant's mouth "on my penis performing oral sex." K.R. pushed defendant's head away, then defendant pulled down his own pants and grabbed K.R.'s arm and pulled it toward defendant's erect penis. K.R. told him he did not want to and it felt wrong. Defendant responded by telling K.R. "not to mention anything to either of my parents or to anybody and I—and I said I would not." K.R. was six years old at the time.

¶ 10    The following winter, another incident occurred when K.R was seven years old, at defendant's bedroom during a guitar lesson. Defendant placed his hand on K.R's thigh and moved it toward K.R.'s genital area. K.R. grabbed defendant's hand and said, "I don't want to do that." Defendant stopped and asked K.R. not to "tell anybody, your parents or anybody." A third incident

occurred when K.R. was seven years old, in 2012, again for a guitar lesson, this time in defendant's living room. K.R. dropped his guitar pick, defendant knelt to pick it up and "placed his hand on my crotch through my clothing again," touching K.R.'s penis over K.R.'s pants. Defendant stopped when K.R. slapped his arm, but again told K.R. not to tell anyone.

¶ 11    K.R. testified that he did not disclose any of these incidents to anyone until approximately July 2018, when he was 13 years old. He spoke out to his brother S.R. after S.R. revealed he had experienced "incidents" with defendant. He explained that he did not say anything earlier because "I was young, I was scared. [Defendant] held a position of power over me in a sort of way that I felt like he had some kind of authority and I trusted him." On cross-examination, K.R. testified that he found out that defendant had been arrested in 2014 "for stuff that he had done," after which his mother had questioned him as to whether anything happened to him. K.R. denied anything had happened, which was a lie. In 2018, S.R. told him, "I came forward and you should, too," indicating to K.R. that S.R. suspected defendant had also done something to K.R. On redirect, K.R. testified that he learned in 2014 (when he was nine years old) that defendant had been arrested for "sexual crimes against minors." K.R. stated that he had lied to his mother because defendant was in "a position of power over me [and] I was scared I was going to get in trouble."

¶ 12    S.R. testified that he was 20 years old at the time of trial and had known defendant "ever since I was little." S.R. described defendant as "a friend of my dad's" who played in the church band while S.R. was growing up. S.R. took an interest in playing guitar, and defendant became his guitar teacher when S.R. was between ten and twelve years old. S.R. took regular but informal lessons from defendant at S.R.'s house, at defendant's house, sometimes with K.R., but often alone. He estimated that he took 15 to 20 lessons overall from defendant.

¶ 13    S.R. testified to three instances in which defendant sexually abused him or attempted to do so. On one occasion, defendant was giving S.R. a guitar lesson in the bedroom S.R. shared with K.R. when defendant removed his shirt revealing moles on his back. S.R. asked what they were, to which defendant replied "love spots," adding that S.R. would get them one day. Defendant then touched S.R.'s penis with his hand and mouth. S.R. described defendant's penis as erect but stated that defendant did not place his penis in S.R.'s mouth and did not testify to any other contact. On the second occasion, defendant was at S.R.'s house, but S.R. could not recall why. S.R. was lying on the floor because he did not feel well. Defendant approached, put his hand in S.R.'s pants and touched S.R.'s penis, "skin on skin." On the third occasion, defendant was giving S.R. a guitar lesson in S.R.'s new basement bedroom when defendant "tried to touch me." S.R. told him no and defendant left the room.

¶ 14    When asked how old he was when these incidents occurred, S.R. estimated that he received guitar lessons from defendant between age 10 and 12. When asked for more specificity, he said the incidents possibly occurred when he was 11 or 12. He was certain, however, that the incidents occurred before he was 13. He knew this because the incidents all preceded defendant's expulsion from the church, which S.R. learned about while he was in his church's basement for youth Sunday school, a program he attended until he was 13.

¶ 15    On cross-examination, S.R. testified that he would sometimes call defendant to set up a guitar lesson, but "every once in a while [defendant would] pop in" when S.R.'s parents were not home. S.R. stated that he did not remember if the first incident he testified to on direct examination was actually the first time defendant did something inappropriate with him, adding "I just remember it was the one that stood out to me. It's been ten years." S.R. recalled hearing that defendant was arrested for sexual abuse in 2014, after which S.R.'s family and some people at

church asked him if defendant had touched him improperly. S.R. said no because he did not want to talk about it. S.R. further testified that, after the third incident, when defendant tried to touch him and S.R. told him no, he saw defendant "trying to get my brother to touch [defendant's penis]." S.R. said that when he saw that, he "just walked out." K.R. was eight or nine years old at the time.

¶ 16    S.R. testified that, when defendant was sent to prison in 2014, S.R. knew why. When defendant was released, S.R. decided to report defendant's sexual abuse because he was worried about him molesting someone else. S.R. reported the incidents to his pastor and parents. He then reported the matter to the police. He testified,

> "I knew Ronald was out of jail and I know I'm strong enough I couldn't live with it. I—I've buried it in the back of my mind already, but I know there are people out there who are not able to do that and I don't want him to get to the wrong kid or any other kid, for that matter, but I don't want the wrong person to get molested and they're not able to live a good life because it torments them for the rest of their life, so that's why I went and reported it."

Defense counsel then asked, "But you knew your own brother had been molested and you did nothing; correct?," to which S.R. replied, "Correct."

¶ 17    On redirect, S.R. testified that in 2014 he was 12 years old and "too embarrassed" to be truthful when he was asked whether defendant had molested him.

¶ 18    The State next called Ronald Perry, the pastor at the church that Bruce R., S.R., K.R., and defendant all attended during the relevant time period. Perry first met defendant when Perry moved to that church 36 years prior to trial, but later also employed defendant for several years at Perry's lawn care company. Perry testified that defendant was "no longer welcome as a member of the

church" effective February 2, 2014, because "something happened." Defendant no longer participated in the church after that date.

¶ 19    On cross-examination, Perry remembered February 2, 2014, because that day defendant "came in and shoved his wife into the pew and was screaming and yelling." From the pulpit, Perry asked defendant to "calm down," and one of the deacons "had to remove him screaming from the church."

¶ 20    The State then called Jeremy Grubbs, investigations sergeant with the De Kalb County Sheriff's Office, where he had been employed for 26 years. In September 2018, Sergeant Grubbs and his partner, Detective Duening, travelled to Manitowoc, Wisconsin, to meet with defendant. Defendant agreed to speak with them, advising that he knew Bruce R. through church, music, and family outings, and that he had performed drywall work for Bruce in Wisconsin. The detectives told defendant that S.R. and K.R. had reported some inappropriate contact with him, after which defendant initially did not respond, remaining quiet. Defendant at some point explained that he had given some guitar lessons to Bruce's family members. While defendant initially said the lessons were at the residence of Bruce and his family and denied that they had occurred at his residence, he later admitted some lessons had occurred at his home, but said that defendant's children would have been present if that happened. Defendant was asked if anything had ever happened during the guitar lessons that could have been mistaken for inappropriate. He responded that nothing like that had ever happened, although he also said at one point, "I don't know." He also commented that "he didn't know what was appropriate and what was inappropriate when referring to some type of contact." Sergeant Grubbs described defendant's demeanor as sometimes evasive when asked about S.R. and K.R., adding that, "although he would answer questions," he would also divert the topic to the church or the pastor at times. Notably, defendant at one point

asked the detective what the boys' names were, which seemed odd, considering the closeness of the relationship between the families.

¶ 21    On cross-examination, Sergeant Grubbs stated that the interview lasted approximately two and a half hours, including breaks when defendant left the room. Defendant answered all their questions.

¶ 22    Next to testify was D.V., the victim in one of the 2014 cases to which defendant had previously pleaded guilty. In July 2014, when D.V. was 13 or 14 years old, he was in a park when his bike broke. He tried calling several people for help, but nobody answered. When he called defendant, defendant came to pick him up. Instead of taking D.V. home, defendant drove him to defendant's apartment. While still in defendant's vehicle, defendant remarked that his " '[his] dick gets hard' " when he sees D.V. Once inside the apartment, defendant asked D.V. to lie on the bed so that he could give D.V. a massage. D.V. removed all his clothes except his underwear. As he massaged D.V., defendant touched him all over, including his buttocks. When defendant touched D.V.'s "genital area," D.V. told him to stop. Defendant then drove D.V. home and said "don't tell anybody." On cross-examination, D.V. confirmed that defendant's hand had touched his genitalia while defendant was massaging him.

¶ 23    Next, Deputy United States Marshal Jonathan Miller, formerly a Sycamore detective, testified for the State that, in December 2014, he was the principal officer investigating the case involving D.V. Miller interviewed defendant at the De Kalb County Sheriff's Office and read him his *Miranda* rights, which he waived in writing. Defendant admitted knowing D.V. but denied having any contact with him. Later, when asked if his phone might contain any records of calls between defendant and D.V., defendant stated that a child acquaintance of D.V.'s would sometimes use defendant's phone to contact D.V., so if there were any records, it would be because

the other child was using his phone. Defendant initially denied having D.V. at defendant's residence, but later revised his statement to say that D.V. was at his residence but only in the presence of other people. Defendant admitted that he may have rubbed D.V.'s back near his shoulders, but denied that D.V.'s shirt was off or that defendant had his shirt off. He then clarified that he was at his home with D.V. and possibly defendant's son.

¶ 24    The State rested and defendant presented evidence, including the testimony of Perry and Marshall Miller, which had been taken out of order during the State's case in chief.

¶ 25    Testifying as a defense witness, Ronald Perry stated that he owned a construction business at the time he was pastor at the church that defendant attended. He said he started a lawn care business in 1997 for defendant to work at and "because we can put some of the young people to work in the church." Perry set up the business because "I felt bad for him and his family" after defendant was fired from his job and "was no longer employable." Defendant worked there until he quit in November or December 2013. Defendant then tried to bid for Perry's customers, which was unsuccessful. Perry stated that he was hurt by this, but that defendant's two sons continue to work for Perry and still attend the church where he continues to be pastor.

¶ 26    K.R. and S.R.'s father Bruce had been a deacon in Perry's church for several years. Perry testified that he was no closer with that family than any other, but one day after Sunday morning service, S.R. asked to speak with him. S.R. began to tell Perry about defendant molesting him and they spoke for a few minutes, after which Perry stopped him and told him, "[w]e need to get your mom and dad in here and you need to make a police report for it and you need to get some counselors involved in this for you." He believed he told the parents but did not specifically remember. Perry testified that he had spoken to the police before about "another incident" involving defendant and boys, although he did not recall how many years earlier it had occurred

or what the specific facts were. On cross-examination, Perry confirmed that the conversation with S.R. occurred in July 2018 and that S.R. had not spoken to him about defendant prior to that time.

¶ 27 Miller testified in defendant's case in chief that, in D.V.'s December 16, 2014, victim sensitive interview at the Children's Advocacy Center, D.V. did not state that defendant had touched D.V.'s genitals or buttocks, nor did D.V. state that his pants were removed. On cross-examination, Miller testified based on his report that D.V. did say in the recorded interview that defendant took him in a white truck to defendant's apartment, that defendant said to D.V. "when I see you, my dick gets harder" and asked D.V. for a massage, which occurred in defendant's bedroom, that defendant pulled D.V. onto the bed and removed his shirt, that D.V. was face down on the bed and defendant was seated on top of D.V.'s legs while defendant rubbed D.V.'s back down to below his buttocks, that defendant had D.V. turn over so defendant could rub D.V.'s chest down to his thighs, and that defendant "got close to his genitals" and told D.V. to open his legs while he rubbed D.V.'s thighs.

¶ 28 Defendant then called Betty Jo Fortune, defendant's ex-wife. They divorced seven years prior to trial, but they were still married in 2013 and 2014. She testified that she never observed any spots on defendant's back. On cross-examination, she testified that she was married to defendant for 26 years and was not present for any incidents in which defendant exposed his penis to S.R. or where S.R. mentioned "love spots" on defendant's back.

¶ 29 The defense rested and the State called D.V. in rebuttal. D.V. admitted that he did not mention in the interview with Miller that defendant touched his buttocks or genitals. He explained that he was "scared back then and [he] really didn't understand what happened to [him]." He affirmed that he was now testifying truthfully that defendant touched his buttocks and genitals.

¶ 30    After the close of evidence but prior to closing arguments, the State nol-prossed counts 3, 4, and 7, electing to proceed only on count 1, the Class X predatory criminal sexual assault charge, and count 2, the Class 2 aggravated criminal sexual abuse charge.

¶ 31    After hearing closing arguments, the trial court set the matter for ruling four days later. On October 17, 2022, the court issued its ruling, finding defendant guilty of both predatory criminal sexual assault of a child for placing his mouth on S.R.'s penis during the guitar lesson and aggravated criminal sexual abuse for putting his hands in S.R.'s pants and touching his penis while he was lying on the floor.

¶ 32    At the sentencing hearing held on December 8, 2022, the State first argued that the court should consider evidence that both defendant's father and son were both convicted child sex offenders. The court allowed the argument over objection because it was information contained in the pre-sentence investigation report (PSI).

¶ 33    The State then presented certified records showing that defendant had five prior felony sex offense convictions. The first, occurring between 1987 and 1989 when defendant was between the ages of 19 and 21, was for aggravated criminal sexual abuse of a victim under 13 years old, a Class 2 felony in which defendant pleaded guilty to touching the victim's penis. The State noted that another count for criminal sexual assault was dismissed as part of plea negotiations, arguing that the court should "still consider the nature of the act," which was that defendant placed his penis in the mouth of the child victim. Defendant was sentenced to three years' imprisonment for this case.

¶ 34    The second conviction was in 1998 for failure to comply with the terms of sex offender registration, for which he sentenced to 30 months' conditional discharge.

¶ 35    Defendant's other three convictions were entered pursuant to negotiated pleas in 2015. One was unlawful communication with a child by a child sex offender in a public park occurring

between July and October 2014. Defendant was sentenced to four years' imprisonment for this crime. The second was unlawful association by a child sex offender, in which defendant was present at a taekwondo facility hosting an overnight "junior sleepover party, exclusively directed towards persons under the age of 18," which occurred on November 14, 2014. Defendant was also sentenced to four years' imprisonment for this crime. Finally, defendant pleaded guilty and was sentenced to five years' imprisonment for aggravated criminal sexual abuse of a victim under 13 years old (D.V.). All three sentences were ordered to run concurrently and various charges were dismissed, per the negotiated plea agreement on June 18, 2015.

¶ 36    The PSI noted that defendant "denied his involvement in the offense," stated that he had not had an opportunity to present alibis, and said he felt that his pastor was retaliating against him. Defendant had lived with his mother, with whom he has "a very close relationship" and who was not in good health. They spoke every day and took walks, watched TV, and went out to dinner. Defendant reported that he "helped his mom pay taxes."

¶ 37    The State also submitted victim impact statements from K.R. and S.R. K.R. said he forgave defendant but could never forget the things he did to him. K.R. told the court that he still had "a constant battle in my mind," replaying what happened and having flashbacks. S.R. told the court that he learned "you can't trust everyone no matter how close of a friend they are to your family." S.R. minimized the impact of the offenses against him, stating, "I can't say my life was negatively affected by this. What happened to me almost 10 years ago has pushed me to be a better man and made me who I am." However, he added, "I wasn't there to help my brother. I was too immature and embarrassed at the time ***."

¶ 38    The State summarized the statutory factors in aggravation that it felt were applicable. Citing section 5-5-3.2(a)(1) of the Unified Code of Corrections (Code) (730 ILCS 5/5-5-3.2(a)(1)

(West 2020)), the State alleged defendant's conduct caused serious harm to both S.R. and K.R., describing as "emotional trauma" the impact attested to by both victims at both the trial and sentencing hearing. As listed above, the State asserted that section 5-5-3.2(a)(3) of the Code (*id.* § 5-5-3.2(a)(3)) applied due to defendant's "extensive" prior history. The State also argued that section 5-5-3.2(a)(7) of the Code (*id.* § 5-5-3.2(a)(7)) applied, merely stating that "the sentence is necessary to deter others from committing the same offense." The State then cited section 5-5-3.2(a)(11) of the Code (*id.* § 5-5-3.2(a)(11)) as "not necessarily applicable" because the offense did not occur in a place of worship, but nonetheless argued it was "interesting" because defendant used "a very closely knit religious community."[2] The State asserted that section (a)(14) of the Code (*id.* § 5-5-3.2(a)(14)) also applied, in that defendant held a position of trust or supervision over S.R. and K.R., being their parents' friend, the boys' guitar teacher, and being in an *in loco parentis* situation. Finally, the State argued that defendant was eligible for consecutive, extended term sentences on each count and asked the court to impose an aggregate sentence of 50 years' imprisonment.

¶ 39    In mitigation, the defense argued that some of defendant's prior convictions did not involve sexual acts, that defendant was reformed and "a completely different person" than he was in 2014, and that defendant had taken extensive classes and counseling and had not re-offended. The defense also argued that the instant offense was not new and, if known by the court at the time of sentencing on his prior convictions in 2015, would not have resulted in as lengthy a sentence as

---

[2]The State's argument might be better understood under section 5-5-3.2(a)(6) of the Code, as defendant arguably "utilized his *** position within the community to commit the offense, or to afford him an easier means of committing it." *Id.* § 5-5-3.2(a)(6).

the State was seeking now. Defendant also submitted six letters and asked the court to consider his post-prison life in mitigation. In the letters, defendant's current pastor, along with friends and neighbors from the previous seven years, attested to his good character, religious faith, and trustworthiness. One letter discussed how much support defendant gives his elderly mother, including trips to the doctor, lawn care, snow removal, household help, and companionship.

¶ 40    In his allocution, defendant stated that he had successfully completed an extensive sex offender treatment program, that he had "done everything that I could to better my life," and that he was "not that same person" as before.

¶ 41    The trial court continued the sentencing to "take some time to read through all the exhibits that were admitted for purposes of sentencing so that I can give thoughtful consideration to both sides in my sentencing ruling."

¶ 42    On January 4, 2023, the trial court imposed its sentence after having considered statutory factors in aggravation and mitigation.The court first noted "no applicable statutory factors in mitigation." As for aggravating factors, the court found that defendant's conduct "caused or threatened serious harm" and that S.R. "was seriously psychologically harmed" by defendant. The court added that S.R. was "embarrassed" and had "experienced feelings of guilt for years because at the time he was too young and emotionally immature to help his younger brother [who] he knew or believed *** had also been assaulted by the defendant." S.R. "lost his ability to trust other people." The court further noted that defendant had an extensive criminal history involving sex offenses and youthful victims. The court noted that the sentencing range for predatory criminal sexual assault of a child was 6 to 60 years' imprisonment (see 720 ILCS 5/11-1.40(a)(1), (b)(1) (West 2012)). As for aggravated criminal sexual abuse, the court found that defendant was eligible for an extended term of 3 to 14 years' imprisonment because he had a prior Class 2 felony

conviction. See *id.* § 11-1.60(c)(1)(i), (g)(aggravated criminal sexual abuse is a Class 2 felony); 730 ILCS 5/5-4.5-35(a) (West 2012) (extended term sentencing range for a Class 2 felony is 7 to 14 years' imprisonment); *id.* § 5-5-3.2(b)(1) (West 2012) (eligibility for an extended term sentence based on a prior conviction of "the same or similar class felony or greater class felony[ ]"). The court also noted that the sentences must be served consecutively. Additionally, the court determined that the sentences it would impose were necessary to deter others from committing the same crime.

¶ 43    The trial court also commented that, when it sentenced defendant in 2015 for his 2014 convictions, it was unaware of defendant's misconduct toward S.R. and K.R. as described at the trial in this case. The court further found that defendant had "shown no acknowledgement to th[e] Court that he believes sexually abusing young children is wrong and it is, in fact, a crime." The court added that defendant "knows how to very nicely gain the trust of church members, neighbors, families with young children and young children themselves[ ] [and] [h]e has then abused that trust after maneuvering a way to be alone with the child." The court also found that defendant has "a propensity to commit sexual offenses against children."

¶ 44    The trial court then acknowledged the several letters attesting that defendant is "honest, moral and ethical and he is a changed man since his release from prison." The court added that, to its knowledge, defendant has not reoffended since his most recent release from prison.

¶ 45    Just before imposing sentence, the trial court stated that it had reviewed and considered the sentencing hearing exhibits; defendant's allocution; the victim impact statements; the letters supporting defendant; the PSI; defendant's history, character, and attitude; the arguments of counsel; the trial evidence; the factors in mitigation and aggravation; and the cost of confinement. The court then sentenced defendant to 30 years' imprisonment for predatory criminal sexual

assault of a child and 10 years' imprisonment for aggravated criminal sexual abuse, the sentences to run consecutively.

¶ 46    Defendant filed a motion to reconsider his sentence, arguing the sentence was excessive given S.R.'s victim impact statement indicating the offense did not negatively affect him and the fact that defendant's incarceration made him incapable of caring for his elderly mother or financially supporting anyone in his family. In denying that motion, the trial court noted that it believed its sentencing ruling was thorough and complete and had stated its reasons for the sentence. Defendant, in turn, filed this timely appeal.

¶ 47                              II. ANALYSIS

¶ 48    Defendant contends that we should either remand for resentencing or reduce his sentence under Illinois Supreme Court Rule 615(b)(4) (eff. Jan. 1, 1967) because the trial court (1) ignored his mitigation evidence, (2) improperly considered in aggravation the psychological harm to the victim, S.R., and (3) imposed an excessive sentence.

¶ 49    It is well established that the trial court's sentencing decision is entitled to great deference. *People v. Stacey*, 193 Ill. 2d 203, 209 (2000). This is so because the trial court, having observed the defendant and the proceedings, is in a much better position to consider the various sentencing factors. *People v. Snyder*, 2011 IL 111382, ¶ 36. Indeed, the trial court is best positioned to fashion a sentence that strikes the proper balance between protecting society and rehabilitating the defendant. *People v. Boots*, 2022 IL App (2d) 200640, ¶ 42. Accordingly, we will not disturb a sentence within the applicable sentencing range unless the trial court abused its discretion. *Stacey*, 193 Ill. 2d at 209-210. A sentence is an abuse of discretion only if it is at great variance with the spirit and purpose of the law or manifestly disproportionate to the nature of the offense. *Id.* at 210.

We may not substitute our judgment for that of the trial court merely because we might have weighed the pertinent sentencing factors differently. *Id.* at 209.

¶ 50    In determining an appropriate sentence, relevant considerations include the nature of the crime, public protection, deterrence, punishment, and the defendant's rehabilitative prospects. *Boots*, 2022 IL App (2d) 200640, ¶ 43. The weight to be given to each aggravating and mitigating factor depends on the circumstances of each case. *Id.* We presume that the trial court considered all relevant factors in determining a sentence, and that presumption will not be overcome without explicit evidence from the record that the court did not consider mitigating factors or relied on improper aggravating factors. *Id.*

¶ 51    Here, defendant's prison sentences of 30 years for predatory criminal sexual assault conviction and 10 years for aggravated criminal sexual abuse were well within the applicable sentencing ranges. See *supra* ¶ 42. Nonetheless, defendant argues that the trial court abused its discretion.

¶ 52                              A. Factors in Mitigation

¶ 53    Defendant argues that the trial court disregarded the evidence he produced in mitigation. We disagree. First, we note that the court continued the sentencing hearing to review "all" of the sentencing evidence and "give thoughtful consideration to both sides" in determining the sentence. Although the court found "no applicable *statutory* factors in mitigation" (emphasis added), it nonetheless specifically mentioned defendant's mitigation evidence when explaining its sentence. See *People v. Brunner*, 2012 IL App (4th) 100708, ¶ 49 (noting that the statutory list of mitigating factors is nonexclusive). In imposing its sentence, the court referenced defendant's supporting letters, which, the court noted, attested that he was "honest, moral and ethical and he is a changed man since his release from prison." The court added that defendant had not reoffended since his

most recent release from prison. The court further commented that, in fashioning the sentence, it had reviewed and considered, among other things, all of the sentencing evidence, defendant's allocution, the supporting letters, and the factors in mitigation. The record shows that the court considered the mitigation evidence, and the sentences themselves—prison terms slightly below the mid-range for predatory criminal sexual assault of a child and slightly above the mid-range for criminal sexual abuse—reflect that the court gave weight to the mitigation evidence, especially in light of defendant's prior record of similar offenses. Thus, defendant has not shown that the court abused its discretion in imposing the within-range sentences.

¶ 54    Defendant also argues that the trial court's statement, "the Court finds there are no applicable statutory factors in mitigation," evidenced a failure to accord weight to the "excessive hardship to his dependents" factor (730 ILCS 5/5-5-3.1(a)(11) (West 2018)), or, in the alternative, the "defendant serves as the caregiver for a relative who is ill, disabled, or elderly" factor *id.* § 5-5-3.1(a)(19) (West 2020). The parties have argued over the applicability of each version of the statute, given the timing of its amendment relative to the offense and sentencing dates. However, we need not consider that discussion, as defendant's argument fails under either version of the statute.

¶ 55    We begin by noting that, despite the trial court's statement, we consider "the record as a whole, rather than focusing on a few words or statements by the trial court." See *People v. Dowding*, 388 Ill. App. 3d 936, 943 (2009); *cf. People v. Abdelhadi*, 2012 IL App (2d) 111053, ¶ 17 (noting that the requirement to "specify on the record the factors that led to its sentencing determination was not intended to be a trap for the trial court"). The record reveals that the court explicitly stated that it had "reviewed and considered *** the letters submitted in support of the defendant." While these letters included no mention of any dependents, the letters did contain two

references to defendant's relationship with his mother. One letter stated, "I never saw any man take care of his mother the way Ronald does! And she needs him at her age!"[3] The other wrote, "She is getting older, and with health issues of her own, she relies on him for so many things [such as errands], trips to the doctor, lawn care, snow removal, household help, and *** companionship." Additionally, the court stated that it had considered the PSI, which stated that, prior to trial, defendant "lived with his mother," helped her "pay taxes," and they took walks, watched TV, and went out to dinner together. No caregiving responsibilities were listed in the PSI and, although defendant has adult children, siblings, and grandchildren, he is not in communication with most of them and there were no financial or other responsibilities listed in the PSI or presented at the sentencing hearing.

¶ 56    Thus, there was no evidence whatsoever of "excessive hardship to his dependents" under the old version of the statute. Under the new version, the evidence that defendant was "the caregiver"[4] for his mother was weak at best, thus the trial court's indication that it did not consider

---

[3]The PSI stated that defendant's mother was 74 years old at the time of sentencing.

[4]The term "the caregiver" is not defined in the Criminal Code. Elsewhere in the Illinois Compiled Statutes, definitions are not particularly helpful. See, *e.g.*, 320 ILCS 65/15 (West 2022) (Family Caregiver Act: " 'Caregiver' or 'family caregiver' means an adult family member, or another individual, who is an informal provider of in-home and community care to an older individual, or a grandparent or older individual who is a relative caregiver."); 210 ILCS 91/5 (West 2022) (Caregiver Advise, Record, and Enable Act: " 'Caregiver' means any individual designated by a patient to provide after care to a patient."); 755 ILCS 5/4a-5 (West 2022) (Probate Act: " 'Caregiver' means a person who voluntarily, or in exchange for compensation, has assumed

this to be a mitigating factor in this case. But, to the extent that these letters lent any support to the idea that defendant qualified as "the caregiver," the court clearly considered this information in determining the sentence, along with the other mitigation evidence submitted on defendant's behalf. Further, defendant was convicted of crimes that carried, in his case, a minimum period of incarceration of 6 to 10 years with consecutive and extended terms, meaning that defendant would not be available for any potential caregiving for such a long time that such responsibilities, if any there were, could reasonably be given very little weight by the sentencing court.

¶ 57    Defendant next argues that the trial court failed to consider defendant's "strong rehabilitative potential," citing defendant's "successful completion of sex offender treatment and subsequent incident-free life." This argument ignores the court's statements at the sentencing hearing that it had considered defendant's allocution to that effect, along with the PSI containing such information, as well as counsel's arguments to that effect. Further, the trial court is presumed to have considered the defendant's rehabilitative potential and there is nothing in the record to rebut that presumption. *Boots*, 2022 IL App (2d) 200640, ¶ 45.

¶ 58                              B. Factors in Aggravation

¶ 59    Second, defendant argues that the trial court abused its discretion by improperly considering certain aggravating factors. Specifically, defendant asserts that the court erred in considering the psychological harm to the victim, S.R., because that harm was inherent in the offenses. Additionally, defendant points to S.R.'s statement, "I can't say that my life was too

_____

responsibility for all or a portion of the care of another person who needs assistance with activities of daily living.").

negatively affected by this," as proof that the degree of harm to S.R. was not serious enough to place it beyond that harm which is already inherent in the offense.

¶ 60    A trial court has broad discretion when imposing a sentence. *Stacey*, 193 Ill. 2d at 210 (2000). However, it may not consider in aggravation a factor "implicit in the offense." *People v. Phelps*, 211 Ill. 2d 1, 11 (2004). Put another way, a single factor cannot be used both as an element of an offense and as a basis for imposing a harsher sentence than might otherwise have been imposed. *People v. Gonzalez*, 151 Ill. 2d 79, 83-84 (1992). Such dual use of a single factor is often referred to as a "double enhancement." *Id*. The prohibition on double enhancement is premised on the rationale that the legislature has already considered that factor when setting the applicable sentencing range and, thus, it is improper to consider it once again to impose a greater penalty. *Abdelhadi*, 2012 IL App (2d) 111053, ¶ 9. A defendant has the burden of showing that a sentence was based on an improper consideration. *Id.*

¶ 61    When an aggravating factor is an element of the crime, such as the age of the victim in an aggravated criminal sexual assault of a victim under 13 years of age, it is improper to increase a defendant's sentence based on that factor. *People v. Edwards*, 224 Ill. App. 3d 1017, 1033 (1992); see also *Dowding*, 388 Ill. App. 3d at 943-44 (2009) (holding that the trial court erred in stating that death of the victim was an aggravating factor in reckless homicide, in which death is inherent); *People v. White*, 114 Ill. 2d 61, 66 (1986) (holding that the trial court erred in considering the victim's age as an aggravating factor when age was an element of aggravated battery to a child); *cf. People v. Conover*, 84 Ill. 2d 400, 404 (1981) (holding that proceeds taken in theft and burglary are factors "implicit in most burglaries and every theft" and therefore were not "compensation for committing the offense" under then-existing statutory factors in aggravation); *People v. Brownell*, 79 Ill. 2d 508, 525-26 (1980) (explaining that almost all murder victims are "an eyewitness or

possessed other material evidence" and are thus prevented from testifying, and therefore it was improper to consider as an aggravating factor for whether the defendant was eligible for the death penalty). Although a trial court may not consider a factor inherent in the offense as a factor in aggravation, it is appropriate to consider the "nature and circumstances of the crime," including the degree and gravity of the defendant's conduct. *People v. Saldivar*, 113 Ill. 2d 256, 269-71 (1986) (holding in a voluntary manslaughter case that the trial court could "consider the force employed and the physical manner in which the victim's death was brought about"); see also *People v. Kelley*, 2019 IL App (4th) 160598, ¶ 117 (although death may be inherent in an offense, the detrimental impact on the victim's family is not). Indeed, "[c]ertain criminal conduct may warrant a harsher penalty than other conduct, even though both are technically punishable under the same statute." *Id.* at 269. Although "the classification of a crime determines the sentencing range, the severity of the sentence depends upon the *degree of harm* caused to the victim and as such may be considered as an aggravating factor in determining the exact length of a sentence, *even in cases where serious harm is arguably implicit in the offense for which a defendant is convicted*." (Emphasis in original). *Id.* Thus, although the court cannot properly focus on "the result of [the] defendant's conduct," it can consider "the *degree* of harm, emotional or physical, caused by that conduct." (Emphasis in original.) *People v. Jeffers*, 2022 IL App (2d) 210236, ¶ 26.

¶ 62    Although the imposition of a sentence is normally within the trial court's discretion and, hence, is reviewed with great deference, the question of whether the court relied on an improper factor in imposing a sentence ultimately presents a question of law, which is reviewed *de novo*. *Abdelhadi*, 2012 IL App (2d) 111053, ¶ 8.

¶ 63    In determining whether the trial court based its sentence on an improper factor, the reviewing court should consider the entire record rather than focusing on a few words or statements

by the trial court. *Dowding*, 388 Ill. App. 3d at 943. A sentence based on an improper aggravating factor will not be affirmed unless the reviewing court can determine from the record that the weight placed on the improperly considered factor was so insignificant that it did not lead to a greater sentence. *People v. Heider*, 231 Ill. 2d 1, 21 (2008).

¶ 64    Here, S.R.'s victim impact statement made in open court in the presence of the defendant clearly sought to minimize the impact of the offenses on his life, but his statements nevertheless reveal psychological harm. First, S.R. testified at trial that he was embarrassed, but also "strong" and had "buried it in the back of my mind already," which indicates that, at age 20, he may not have fully dealt with the depth of the harm these acts caused him. Second, S.R. emphatically stated that he had lost his ability to trust others. Third, and more directly, S.R. clearly indicated that he carried a strong sense of guilt for not preventing defendant from "molesting" his younger brother. S.R.'s guilt was certainly not inherent in the offenses of which defendant was convicted. Many cases have held that the psychological harm inflicted on a child victim of sexual assault is a proper factor to consider in aggravation. See *People v. Kerwin*, 241 Ill. App. 3d 632, 636 (1993); *People v. Nevitt*, 228 Ill. App. 3d 888, 891-92 (1992); *People v. Ulmer*, 158 Ill. App. 3d 148, 149-51 (1987); *People v. Lloyd*, 92 Ill. App. 3d 990, 995-96 (1981); *People v. Fisher*, 135 Ill. App. 3d 502, 506 (1985); *People v. Burton*, 102 Ill. App. 3d 148, 150, 153-54 (1981). Thus, the trial court did not err in finding and considering that defendant's conduct caused or threatened serious harm to S.R.

¶ 65    Moreover, in their arguments over whether S.R.'s psychological harm was severe enough to be considered by the sentencing court, both defendant and the State overlooked the fact that K.R. also presented testimony establishing serious psychological harm. It is well settled that uncharged conduct is relevant at sentencing. *Jeffers*, 2022 IL App (2d) 210236, ¶ 27. Additionally,

the statutory factor in aggravation stating that "the defendant's conduct caused or threatened serious harm" is not limited to the harm suffered by the named victim of the offense, but rather, the statute's use of the word "conduct" (instead of "offense") "appears to mandate a broader look at a defendant's behavior." *Id.* (citing 730 ILCS 5/5-5-3.2(a)(1) (West 2014)). K.R.'s testimony clearly established serious psychological harm, in the form of continuous fear, rumination, and recurring flashbacks even years after defendant's conduct toward him.

¶ 66    Defendant also argues more generally that the trial court treated the instant offenses as "recidivism" when his prior convictions were for offenses occurring at or around the same time. Specifically, the defense avers that, if the trial court had known of these offenses in 2015 when it sentenced defendant on his negotiated plea agreements, the sentence would have been much less than the 45 years' total incarceration between all the cases. Defendant cites no authority for this argument and ignores the court's statement at sentencing: "The extent of the defendant's criminality as it was unknown at the time was not addressed by the Court in its 2015 sentence." Defendant's argument is speculative, unsupported, and wholly without merit. Thus, we reject his contention that the trial court abused its discretion by improperly considering certain aggravating factors.

¶ 67                                    C. Excessiveness

¶ 68    Finally, defendant argues that his aggregate sentence of 40 years' imprisonment is excessive, in that it would result in a "*de facto* life" sentence, as he would not be eligible for parole until age 84. Defendant argues generally that the evidence in mitigation and the objective of rehabilitation "must preclude a *de facto* life sentence," noting that a trial court must ensure that a particular sentence is designed to further both retributive and rehabilitative ends.

¶ 69    The Illinois Constitution provides that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. To achieve the constitutionally mandated balance between the retributive and rehabilitative purposes of punishment, trial courts must carefully consider all aggravating and mitigating factors, including "the defendant's age, demeanor, habits, mentality, credibility, criminal history, general moral character, social environment, and education, as well as the nature and circumstances of the crime and of defendant's conduct in the commission of it." *Boots*, 2022 IL App (2d) 200640, ¶ 41. Reviewing courts presume that a sentence within the sentencing range is proper, absent an affirmative showing that the sentence "greatly departs from the spirit and purpose of the law or the constitutional guidelines." *Id.* at ¶ 44. We find that defendant has not made such a showing.

¶ 70    The sentencing range for predatory criminal sexual assault of a child, a Class X felony, is 6 to 60 years' imprisonment. See 720 ILCS 5/11-1.40(b)(1) (West 2012). Defendant's sentence of 30 years' imprisonment on this offense was at the very center of that range. The sentencing range for aggravated criminal sexual abuse, a Class 2 felony, is 3 to 14 years. See *id.* § 11-1.60(g). Defendant's sentence of 10 years' imprisonment was within that range. (The sentences run consecutively, which is mandatory and not in dispute.)

¶ 71    Reviewing courts may not disturb a sentence within the applicable sentencing range unless the trial court abused its discretion. *Boots*, at ¶ 42. Further, we may not substitute our judgment for that of the trial court merely because we might weigh the pertinent factors differently. *Id*. The sentences here are within the applicable sentencing range. The sentencing court not only considered proper factors in aggravation and mitigation, but also correctly ignored improper factors and arguments. See, *e.g.*, *supra* ¶¶ 32, 38. Defendant's prior record of felony convictions

for sexual offenses against children, the nature and circumstances of the offenses herein, including defendant's use of family and church relationships to establish trust and opportunity, and defendant's denial of responsibility and refusal to accept that sexually abusing children is wrong, are all sufficient bases for a lengthy prison sentence in this case. The trial court did not abuse its discretion in sentencing defendant to an aggregate prison term of 40 years.

¶ 72                                    III. CONCLUSION

¶ 73    For the reasons stated, we affirm the judgment of the circuit court of De Kalb County.

¶ 74    Affirmed.